IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 20, 2002 Session

## STATE OF TENNESSEE v. DONALD C. MCCARY

**Appeal from the Criminal Court for Hamilton County**
**Nos. 190360, 190361, 190523-190527     Buddy Perry, Judge**

--------

**No. E2001-02726-CCA-R3-CD**
**January 10, 2003**

--------

The defendant, Donald C. McCary, was convicted in two separate trials of two counts of aggravated sexual battery, one count of sexual battery, and four counts of statutory rape. There were two minor victims. The aggravated sexual battery convictions related to one victim and the remaining offenses were against the other. By consent of the state and the defendant, this court consolidated the two appeals during oral argument. The defendant claims (1) that the state failed to make a proper election of offenses at the close of the proof; (2) that there was a fatal variance between the indictments and the proof offered at both trials; (3) that the trial court erred by the admission of certain of the evidence; (4) that the trial court erred by denying his motion to suppress evidence seized during the search of his office; (5) that the trial court erred by refusing to suppress certain statements made during the search and after his arrest; (6) that the prosecutor's comments during closing argument were improper; (7) that the trial court erred by failing to declare the defendant incompetent to stand trial; (8) that the trial court erred by permitting amendment of the indictments; (9) that the cumulative effect of the errors denied him the right to a fair trial; and (10) that the trial judge should have recused himself from the hearing on the motions for new trial. The convictions on each count of aggravated sexual battery are affirmed. The remaining convictions are reversed and remanded for a new trial.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed in Part; Reversed and Remanded in Part**

GARY R. WADE, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Howell G. Clements, Chattanooga, Tennessee (on appeal), and Donald C. McCary, pro se (at trial), for the appellant, Donald C. McCary.

Paul G. Summers, Attorney General & Reporter; Kathy D. Aslinger, Assistant Attorney General; Stan Lanzo, Special Prosecutor; and C. Leland Davis and Caldwell Huckaby, Assistant District Attorneys General, for the appellee, the State of Tennessee.

## OPINION

In 1992, the defendant was convicted of thirteen sex offenses against four male victims ranging in age from twelve to fifteen years old. The trial court imposed an effective sentence of seventy-two years' incarceration. See State v. McCary, 922 S.W.2d 511, 512-13 (Tenn. 1996). Our supreme court reversed each of the convictions and remanded for a new trial, finding that the trial court improperly admitted evidence of prior uncharged sexual offenses in violation of Tennessee Rule of Evidence 404(b). Id. at 512-15. Our high court declared that the defendant's diary should have been excluded from evidence and warned that certain pornographic magazines and videotapes most likely should have been excluded as irrelevant. Id. Upon remand, the trial court granted the defendant's motion for a severance of the trials. The trial court also granted the defendant's request to act as his own attorney. This appeal involves two separate trials involving two of the victims.

The first of the two trials took place in August 1997. The defendant was charged with two counts of aggravated sexual battery committed against twelve-year-old J.B.[1] In 1991, when Michael Ron Benefield was sixteen years old, he was a member of the youth choir at Central Baptist Church in Chattanooga, where the defendant served as youth choir director. Benefield, who was taking drum lessons at the church and often recorded his performances, noticed a micro-cassette on a filing cabinet in the choir room. Believing that the cassette was one he had left there at an earlier lesson, Benefield took the tape to his residence. Later, when he listened to the tape, Benefield recognized the voices of the defendant and J.B., a member of the youth group. From the tape, Benefield learned that the defendant had allowed J.B., who was 12 or 13 years old at the time, to drive his car. When Benefield's mother, Joan Benefield listened to the tape, she passed along the information to her husband. Ms. Benefield, who described herself as "sickened" by the content of the tape, testified that she and her husband contacted Chief of Police Eugene McCutcheon, who was also a member of the church. Chief McCutcheon listened to the tape and then assigned two detectives to investigate.

Detective Mark Rawlston, a homicide detective with the Chattanooga Police Department, was able to secure an address for J.B., spoke briefly with J.B.'s mother, and then questioned J.B. at his school. J.B. informed the detective that the defendant had shown him pornographic videos and magazines and had touched his penis. Later, J.B. provided a recorded statement at the office of the district attorney. Based upon information obtained during that interview, Detective Rawlston obtained warrants to search the defendant's residence, vehicle, and office at Central Baptist Church.

When officers arrived to execute the warrant at the church, the defendant left the church building, entered his car, and removed a red briefcase from the trunk. Officers confronted the defendant, who fled into the church. The officers followed and found the defendant hiding beneath some choir robes. Detective Rawlston again informed the defendant that he had a warrant to search his office and took possession of the red briefcase, which had been identified in the warrants as subject to seizure.

---

[1]It is the policy of this court to withhold the identity of minor victims of sex crimes.

The defendant led the officers to his office, where Detective Rawlston informed him of his Miranda rights and advised him that he was not under arrest. When Detective Rawlston asked the defendant how to open the briefcase, which had a combination lock, the defendant responded, "It's Ronnie's[2]. None of it's mine. It's all Ronnie's." Detective Rawlston then opened the briefcase using a combination that J.B. provided. Inside, the detective found several adult magazines and a number of "hardcore" pornographic movies. After closing the briefcase, Detective Rawlston found a full-sized tape recorder on the defendant's desk. The tape included the voice of the defendant discussing J.B.'s whereabouts with a young girl.

After being notified of the search warrant, Dr. Ron Phillips, pastor of the church, accompanied Detective Rawlston to the defendant's office, where the search was being conducted. Dr. Phillips immediately asked the defendant, "What's this all about?" The defendant responded, "It's all Ronnie's. It's all Ronnie's. None of it's mine." When Detective Rawlston asked the defendant where Ronnie was, the defendant answered that Ronnie had been in prison since 1990. Detective Rawlston, referring to a magazine he had taken out of the briefcase, then asked, "If Ronnie has been in prison since 1990, how did the December 1991 issue of Club magazine get into his briefcase?" The defendant then looked at Dr. Phillips and said, "Brother Ron . . . I'm sorry. I am so sorry." As the search continued, the defendant complained to Detective Rawlston that he did not understand what was happening. The detective responded, "Don, it's about raping little kids." The defendant then said, "I haven't done anything to them that they didn't want me to do, and I haven't shown them anything they didn't want to see."

Detective Rawlston also seized three tee-shirts from the credenza in the defendant's office, which, according to J.B., the defendant used to clean up semen following ejaculation. TBI testing established that one shirt contained no semen, a second contained several areas of semen, and the third shirt was approximately 90 percent saturated with the substance. Detective Rawlston also discovered over one hundred pictures of J.B. in the defendant's office, some of which had typed messages on the back. The photographs were taken during church trips to Panama City and Fall Creek Falls and at various locations in Chattanooga.

As part of his investigation, Detective Rawlston discovered that the defendant had made several gifts to J.B., including a warm-up suit, a baseball cap, a collection of cassette tapes, a Timex Ironman watch, two tee-shirts, a phone dialing machine, a gold and diamond ring, lighter fluid, a pair of boxer shorts, a flannel shirt, a video tape, a pocket watch, a razor, shaving cream, aftershave, deodorant, two cigarette lighters, and a key to the defendant's car. The defendant had also loaned J.B. a television/VCR combination.

At trial, Bruce Gentry, who worked for Zales Jewelry in 1991, testified that he had sold a diamond ring to the defendant for approximately $150. Gentry recalled that the ring had to be sized to fit the finger of the young man who had accompanied the defendant to the store.

---

[2] Ronnie is the name of the defendant's brother.

Gaylon B. Wiley, associate pastor at Central Baptist Church, testified that on the evening that the defendant's office was searched, he encountered the defendant and the defendant's twelve-year-old son, Marty, as they were leaving the choir room. Wiley recalled a brief conversation before the defendant began repeating, "I'm ruined. I don't know how they found out. [J.B.] wouldn't have turned me in, [J.B.] loved me, and all [J.B.] wanted to do was to see some pussy, and we looked at the magazines and masturbated."

J.B., eighteen at the time of trial, testified that he was twelve years old when he first became acquainted with the defendant during a church-sponsored trip to Panama City, Florida. He recalled that the defendant asked him to sit with him at dinner and, later that same evening, took him to a Waffle House. The defendant then asked J.B. to spend the night in his cabin. J.B. testified that during the night, the defendant "hugged on" him and rubbed his back and chest. J.B. stated that this made him feel "pretty strange" but admitted that he continued to stay in the defendant's cabin throughout the remainder of the week.

According to J.B., the defendant called him frequently when they returned from Florida, sometimes twice a day, and took him out three or four times a week, usually to eat or to see a movie. He recalled that the defendant often taped their conversations, explaining that the tapes were for his brother. J.B. testified that he had not been exposed to magazines or movies of a sexual nature before becoming acquainted with the defendant. He recalled that during one of the outings, the defendant allowed him to look through a pornographic magazine. He stated that the defendant had a briefcase that contained several pornographic videos and a number of pornographic magazines.

J.B. testified that on a later occasion, the defendant played one of the videos, which depicted a group of people in a room, all involved in some form of sexual activity, in his office at Central Baptist Church. He recalled that the defendant unzipped his pants and masturbated during the video. According to J.B., the defendant played the same pornographic video two or three days later while they were in his office. On this occasion, both he and the defendant masturbated and used a tee-shirt from the defendant's cabinet to clean themselves. He testified that on another occasion at the defendant's office, he and the defendant were masturbating while watching a pornographic video when the defendant reached over and touched his penis. J.B. stated that he pushed the defendant's hand away. Several days later, while on the way to a church hay ride, the defendant told J.B. that he needed to go by his house and change shirts; while at the defendant's house, the defendant played a new pornographic video tape and masturbated.

J.B. testified that one evening, the defendant asked him and M.C.[3] to go to the movies and spend the night at his house. While both J.B. and M.C. went to the movies with the defendant, only J.B. received permission to stay overnight. According to J.B., he awakened from his sleep when the defendant began stroking his penis. J.B. recalled that he got out of bed and went into the bathroom because he was fearful that he would ejaculate.

---

[3]Because M.C., a minor, was also a possible victim of sexual abuse, this court will refer to him only by his initials.

J.B. testified that he and the defendant had a four-month relationship during which the defendant gave him a number of gifts, including a gold and diamond ring, country music tapes, a Nike suit, Reebok pump shoes, shaving accessories, lighters and lighter fuel, a baseball cap, a Carman tape, an automatic dialer, watches, baseball cards, a television/VCR combination, an iguana, and a key to the defendant's automobile. While acknowledging that he was to reimburse the defendant for the purchase price of the ring by making installment payments, J.B. stated that he had no source of income from which to make the payments. J.B. identified the videos found by Detective Rawlston as those that the defendant had shown him. J.B. stated that as a result of the offenses, he experienced a time of depression coupled with suicidal thoughts. He explained that he now has an extreme hatred toward homosexuals, child molesters, and child rapists. According to J.B., the defendant gave him a key to the car because he was permitted to drive it. On cross-examination, J.B. acknowledged that after the first trial in 1991, the prosecutor, Stan Lanzo, had invited him, Detective Rawlston, and Detective Rawlston's wife for a ride on a sailboat. He also acknowledged that his mother had filed a lawsuit against Central Baptist Church as a result of the abuse, but contended that he did not suggest that she do so.

Reverend Barry Clingan, an associate pastor at Central Baptist Church, accompanied Dr. Phillips to the defendant's office after learning that the police were conducting a search. Later, Reverend Clingan received permission to drive the defendant home. He recalled that the defendant admitted showing pornography and masturbating but denied touching any of the youth members.

Detective Mike Mathis of the Chattanooga Police Department testified that he overheard the defendant's conversation in a telephone call he made to his son, Mitch McCary. Detective Mathis, who took notes, heard the defendant admit his guilt, lamenting that "he just wanted to be locked up and throw away the key." Detective Mathis also recalled that the defendant apologized for failing as a father. According to Detective Mathis, the defendant admitted to his wife, Sylvia, that he had lied to her and that "[i]n Tennessee, when you do wrong, you go to jail, and that's where [I'm] going. I messed up." He recalled that the defendant also informed his wife that "she would be embarrassed when it all came out. . . . [H]e wasn't going to hide from it anymore." Detective Mathis testified that the defendant was fully aware of his presence and informed his wife that Detective Mathis was taking notes. He remembered that the defendant directed his wife to move back to Birmingham because he should be incarcerated for "250 years." The detective also heard the defendant confess, "[I'm] just guilty, [you] would be better off to just leave and find [you] a man who would be good to [you]. I'm just guilty. . . . They can't take away our memories or my faith. I'll just have to face God someday for what I've done."

At the conclusion of the proof, the jury returned verdicts of guilt on two counts of aggravated sexual battery against J.B.

Almost immediately after the first trial, the defendant was tried for one count of sexual battery and four counts of statutory rape against J.S., who was fifteen at the time of the offenses. Ron and Joan Benefield testified about the discovery of the tape, offering essentially the same account as that provided at the trial involving J.B. Detective Mark Rawlston testified to the search

of the defendant's office at Central Baptist Church, providing an account identical to that offered in the trial involving J.B. He added that officers found hundreds of photographs of J.S., many containing personal, written commentary on the back. The detective also found several motel room keys which had notations indicating that the defendant had shared a motel room with J.S. during church trips. He also discovered a partially eaten piece of licorice, wrapped in plastic, with the notation "golf, January 1990." Detective Rawlston learned that cassette tapes seized from the defendant's office contained conversations between the defendant and J.S. As indicated, two tee-shirts discovered in the defendant's credenza tested positive for the presence of semen.

In an interview with Detective Rawlston, J.S. admitted to a number of sexual encounters with the defendant, beginning in late March or early April of 1991. Later, Detective Rawlston learned that J.S.'s relationship with the defendant began much earlier and involved some sixty to eighty instances of sexual contact. Detective Rawlston testified that he was able to confirm five specific occasions of sexual contact between the defendant and J.S.

The church pastor, Dr. Ron Phillips, also testified in the second trial. He recalled that when the defendant admitted having shown a pornographic magazine to a boy in the youth group, he helped prepare a resignation letter for the defendant and asked him to sign it. Later, Dr. Phillips heard the defendant acknowledge that he and a boy in the youth group had looked at the pornographic material and had masturbated.

J.S., who became acquainted with the defendant in 1988, when he was eleven or twelve years old, testified that during a church trip to Panama City in the summer of 1989, he spent the night in the defendant's cabin and awoke to find the defendant stroking his penis. After their return to Chattanooga, the defendant contacted him several times a week and took him on frequent outings. J.S. recalled that the defendant showed him a pornographic magazine and, later, a pornographic movie. During the movie, the defendant masturbated. On another occasion, the defendant "helped" J.S. masturbate while they were watching a pornographic video. J.S. testified that the defendant first fondled him to ejaculation sometime in 1989 and did so on a number of occasions thereafter. J.S. stated that the defendant performed oral sex on him for the first time at a motel in Georgia in 1989. J.S. remembered that after the first time the defendant performed oral sex on him, their sexual encounters, which were frequent, consisted of "[p]retty much always oral sex." According to J.S., when the defendant would perform oral sex on him, J.S. would stand while the defendant would be on his knees. J.S. also recalled that the defendant masturbated while performing oral sex on him. J.S. testified that he and the defendant engaged in "oral sex and masturbation" at the defendant's residence prior to July 31, 1991, but did not give any further description of the sexual contact or state the number of times that such contact occurred. J.S. recalled that "oral sex and masturbation" occurred at the church prior to July 31, 1991. J.S. stated that he and the defendant engaged in "oral sex and masturbati[on]" at the church prior to May 30, 1991. J.S. also recalled that he and the defendant engaged in "oral sex and masturbation" at the defendant's residence prior to May 30, 1991. Finally, J.S. testified that he and the defendant had "sex" at the church sometime between April 1 and May 30, 1991. J.S. stated that from the time that the defendant began to perform oral sex on him until he quit working for the defendant in August 1991, the defendant would perform oral sex on him

"[d]uring the summers, probably once or twice a week, and every trip. During the winter . . . we'd go to Gatlinburg and . . . it would happen." J.S. stated that the defendant had sexual contact with him repeatedly "[f]or two and a half years" and that he could not count the number of times that the defendant had performed oral sex on him. J.S. recalled that he was fourteen or fifteen at the time of his sexual encounters with the defendant.

J.S. acknowledged that his parents filed a civil lawsuit against the church as a result of the defendant's actions. He also acknowledged that the prosecuting assistant district attorney, Stan Lanzo, had taken him and the other victims for a ride on his sailboat in 1992.

Travis Joins testified that he had worked as the defendant's assistant in 1991 and had developed a close friendship with both the defendant and J.S. According to Joins, the defendant admitted looking at pornographic magazines with J.S., stroking J.S.'s penis, and performing oral sex on J.S. The defendant informed Joins that he would give J.S. tobacco "to get him a buzz . . . get him relaxed" before performing oral sex. Joins admitted that he had not told anyone about the defendant's admissions before 1992, but he asserted that he had remained quiet only because the defendant, who "had done the same things to [him]," had made threats.

Detective Mike Mathis testified about the several admissions the defendant made during a telephone call made from the police station shortly after the arrest. He provided essentially the same account he provided during the J.B. trial. Raymond DePriest, a forensic scientist with the TBI, confirmed the presence of semen on two of the tee-shirts found in the defendant's office. At the conclusion of the second trial, the jury returned verdicts of guilt for sexual battery and four counts of statutory rape.

# I

The defendant first asserts that the state's failure to elect the particular instances of sexual contact between the defendant and each of the two victims upon which it sought convictions deprived him of the right to a unanimous jury verdict.[4] There is, of course, a fundamental constitutional right under Tennessee law to a unanimous verdict before a conviction for a criminal offense may be imposed. State v. Shelton, 851 S.W.2d 134, 137 (Tenn. Crim. App. 1993); State v. Brown, 823 S.W.2d 576, 581 (Tenn. Crim App. 1991); see also State v. Brown, 762 S.W.2d 135, 137 (Tenn. 1988). Protection of this right may require special precautions by the trial court to ensure that the jury does not reach a "patchwork verdict" based on different offenses. State v. Forbes, 918 S.W.2d 431, 445-46 (Tenn. Crim. App. 1995). When the proof shows the commission of multiple

---

[4]In State v. Rickman, 876 S.W.2d 824, 829 (Tenn. 1994), the supreme court established a "narrow, special rule" allowing for the admission of evidence of other sex crimes but only when the indictment is not time-specific and when the evidence relates to sex crimes that occurred within the period charged in the indictment. In these instances, when the evidence shows the commission of uncharged offenses, the state must elect the particular incident for which a conviction is sought. Id. The rationale is that "evidence of a prior sex crime that is necessarily included within the charge of the indictment is also necessarily relevant to the issues being tried." Id. In Rickman, our supreme court concluded that the victim's testimony about other uncharged sex crimes was erroneous and that the prejudice resulting from the testimony outweighed its probative value. Id. at 830.

acts with multiple results, the results being separate criminal offenses, and there are insufficient counts in the charging instrument to accommodate all of the offenses shown, the usual precaution to assure jury unanimity is to require the election of offenses. State v. Burlison, 501 S.W.2d 801, 804 (Tenn. 1973); State v. Clabo, 905 S.W.2d 197, 205 (Tenn. Crim. App. 1995); Shelton, 851 S.W.2d at 137. "The jury's consideration must be focused on one or more charged offenses by some effective means of election, in order to ensure unanimity on those offenses and no others." Shelton, 851 S.W.2d at 138. When the state presents proof on many offenses within an alleged time period, but neglects election, the jury is essentially permitted to "reach into the brimming bag of offenses and pull out one for each count." Tidwell v. State, 922 S.W.2d 497 (Tenn. 1996). The duty to ensure unanimity exists on the part of the trial court even in the absence of a specific request by the defendant. Burlison, 501 S.W.2d at 804; see also State v. Mitchell, 737 S.W.2d 298, 300 (Tenn. Crim. App. 1987).

In the first of the two trials now on appeal, the defendant was convicted of two counts of aggravated sexual battery of J.B, who testified that the defendant touched his penis in a sexual manner on two occasions, once at the defendant's office and once at the defendant's residence. The indictment charged that one count occurred at the defendant's office and the other occurred at the defendant's residence. While there was abundant evidence of the intimate nature of the relationship between the defendant and J.B., no other sexual offenses were proved. Accordingly, there was no requirement that the state make an election with regard to the charges involving J.B. See Shelton, 851 S.W.2d at 138.

As indicated, the defendant was convicted in the second trial of the statutory rape and sexual battery of J.S., who testified that the defendant had touched his penis and performed oral sex on him once or twice a week during the summer of 1991. The indictment charged only four counts of statutory rape and one count of sexual battery. Although the state was able to establish that sexual contact had, in fact, occurred during each time frame set forth in the indictment, there was proof of more than one sexual encounter during each time frame. The charges in the indictment involving J.S. were as follows:

| COUNT | OFFENSE | LOCATION | DATE |
|---|---|---|---|
| Count I | Statutory Rape | Church | Between April 15 and May 15, 1991 |
| Count II | Statutory Rape | Church | Before July 31, 1991 |
| Count III | Statutory Rape | Residence | Before May 30, 1991 |
| Count IV | Statutory Rape | Residence | Before July 31, 1991 |
| Count V | Sexual Battery | Church | Between April 1 and May 30, 1991 |

Although the proof established that oral sex occurred on multiple occasions within the time frames described in each of the counts, it cannot be determined from the record precisely how many sexual encounters there were between the defendant and J.S. J.S. testified that the defendant performed oral sex on him one or two times per week, thus establishing somewhere between nineteen and thirty-eight separate instances of oral sex from April 1, 1991, the first date included in

the indictment, and July 31, 1991, the last date included in the indictment. The proof also established that the defendant performed oral sex on J.S. an unspecified number of times while on various church trips in 1989, 1990, and 1991. Further, J.S. testified that the defendant performed oral sex on him one or two times a week during the summers of 1989 and 1990, no less than twenty-two times by our assessment.

At the conclusion of the trial, the state did not elect to limit the jury's consideration to only one offense within the time frames or locations listed in each count of the indictment. More than one alternative theory was available as to each count. In fact, during its closing argument, the prosecutor claimed generally that the state had proved at least one instance of sexual contact during each time frame, commenting that "certainly there was a lot more than what we're talking about."

Our law provides that "when evidence suggests that a defendant has committed several sexual crimes against a victim, there must be an election of the particular offenses for which convictions are sought" in order to assure unanimous verdicts on each charge. Shelton, 851 S.W.2d at 137. Here, the jury was left to choose between an unspecified number of incidents within the time frames in each of the five counts of the indictment relating to J.S. In consequence, there is nothing to indicate whether all twelve jurors agreed on the guilt of the defendant as to a specific criminal act under any of the counts in the indictment. Given the difficulty that this court had in determining which specific instances of conduct the state was relying on for conviction, there is no assurance that the jury reached a unanimous verdict on any specific act. Under these circumstances, the defendant's four convictions for statutory rape and the conviction for the sexual battery of J.S. must be reversed and the causes remanded for a new trial.

In a related issue, the defendant implies that the admission of the uncharged sexual offenses committed by him against each of the victims created a variance between the proof and the indictments. Before a variance between an indictment and the evidence could be considered fatal, it must be deemed to be material and prejudicial. State v. Moss, 662 S.W.2d 590 (Tenn. 1984). So long as the defendant is not misled at trial, any variance is not considered to be a basis for reversal. Johnson v. State, 596 S.W.2d 97, 103 (Tenn. Crim. App. 1979). Initially, the defendant has failed to support this issue with argument or citation to authorities. Moreover, he has failed to include appropriate references to the record. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7); State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987). Accordingly, the defendant has waived our consideration of this issue.

In another related issue, the defendant asserts that the trial court erred by admitting evidence of uncharged sexual crimes against the victims in violation of a number of evidentiary rules. As noted above, there was no evidence of uncharged sex crimes against J.B. J.S., however, testified to a number of sexual encounters with the defendant both during and outside of the time frames specified in the indictment. The admission of this evidence is governed by Tennessee Rule of Evidence 404. That rule provides in pertinent part as follows:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admissibility is that the trial court find by clear and convincing evidence that the defendant committed the other crimes or bad acts. State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997). Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible. The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime. Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994). Most authorities suggest that trial courts take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). That perhaps best explains the traditional posture of the courts that any testimony of prior bad acts by a defendant is not usually admissible when used as substantive evidence of guilt of the crime on trial. Parton, 694 S.W.2d at 302-03. In those instances where the prior conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases. State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995).

Exceptions to the rule may occur when the other crime is relevant to an issue other than the accused's character such as identity, motive, common scheme or plan, intent, or absence of mistake. Our supreme court, in State v. Rickman, 876 S.W.2d 824 (Tenn. 1994), expressly declined to establish a "sex crimes exception" to the general rule that evidence of uncharged crimes is inadmissible. In Rickman, the court upheld the general rule, excluding evidence of other crimes or bad acts as irrelevant and prejudicial. 876 S.W.2d at 829.

The high court did, however, establish a "narrow, special rule" which allowed the state "some latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed." Id. at 828 (citing State v. Shelton, 851 S.W.2d 134 (Tenn. 1998)). Evidence of other sex crimes against a child victim may be admitted when the indictment is not time specific and when the sex crimes occurred within the time frame included in the indictment. Id. at 829. As indicated, however, the state must elect at the close of its proof the particular incident for which a conviction is sought, as a means of assuring the constitutional right of the accused to a unanimous verdict. Id.

Even if the challenged evidence is relevant to an issue other than character, it must be excluded if the danger of unfair prejudice outweighs the probative value of the other crime evidence. State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993); see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985); State v. Taylor, 669 S.W.2d 694 (Tenn. Crim. App. 1983). When the trial court substantially complies with the requirements of Rule 404(b), this court will review the trial court's determination for an abuse of discretion. DuBose, 953 S.W.2d at 652.

During the appeal of the defendant's 1992 convictions, our supreme court, expressly referring to its holding in Rickman, held that testimony offered by Travis Joins about his sexual encounters with the defendant while a member of the youth group was inadmissible under Rule 404(b) as to any of the victims:

> Because the charges here involve sexually oriented crimes, we take this opportunity to stress our holding in State v. Rickman, 876 S.W.2d 824 (Tenn. 1994). In Rickman, we expressly rejected an invitation to establish a "sex crimes exception" to the general rule that evidence of uncharged crimes is inadmissible. We concluded: "Our re-examination of the authorities convinces us that the general rule, which excludes evidence of other crimes or bad acts as irrelevant and prejudicial when the defendant is on trial for a crime or act of the same character, remains sound." 876 S.W.2d at 829.

McCary, 922 S.W.2d at 514. The high court concluded that the admission of this evidence could not be classified as harmless because of its "profoundly prejudicial" nature.

As indicated, J.S. testified about encounters of a sexual nature with the defendant other than those charged in the indictments. Our supreme court has held that where the indictment charges that sex crimes occurred over a span of time, evidence of unlawful sexual contact between the defendant and a victim during that time period may be admissible. It is our view, therefore, that the uncharged crimes against J.S. occurring during the specific time frames charged in the indictment fit within the narrow holding of Rickman. Those uncharged crimes occurring in 1989 and 1990 occurred prior to the time frames outlined by the indictment and do not, therefore, fit within the "narrow, special rule" in Rickman. In consequence, the trial court erred by permitting evidence of these offenses. Because there was abundant proof of the defendant's guilt, however, these errors would have qualified as harmless, having no effect on the verdict. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). It is only because the state failed to elect at the close of its proof-in-chief as to the particular offense or offenses for which it was seeking convictions that a new trial is warranted for the charges involving J.S. See Shelton, 851 S.W.2d at 137; Brown, 762 S.W.2d at 137; see also Burlison v. State, 501 S.W.2d 801 (Tenn. 1973).

Because there is likely to be a retrial in this case, the trial court deserves some guidance in this very difficult area of the law. Essentially, the state is presented with two options regarding the admission of evidence of sexual encounters between the defendant and J.S. First, the state may choose to limit its proof to only five sexual encounters between the defendant and J.S. and exclude

testimony regarding the full extent of their relationship. Second, the state may choose to introduce proof of other sexual encounters between the defendant and J.S. during the time frames covered by the indictment, but only if there is an election as to which specific acts are relied upon for the convictions sought. The state must provide the jury with a description of each event so as to assure a unanimous verdict on a specific charge. See Shelton, 851 S.W.2d at 137-138 ("Any description that will identify the prosecuted offense for the jury is sufficient."); cf. State v. Cleander Cleo Hartman, Jr., No. M2000-02411-CCA-R3-CD, slip op. at 11 (Tenn. Crim. App., at Nashville, Jan. 17, 2002) (holding that the state's election, narrowing the offense only to the year 1998, was insufficient to guarantee jury unanimity when the victim testified to more than twenty undistinguishable sexual encounters with the defendant in 1998). Upon retrial, the state should not seek the admission of sexual encounters between the defendant and J.S. occurring outside the charged time frames.

The defendant also contends that the pornographic magazines and videotapes which were found in his briefcase, but not specifically identified by either victim, should have been excluded under Rule 404(b). Although the rule is usually applied to other crimes, wrongful acts, or misconduct, its language does not require that the acts covered be either criminal or wrongful. It states that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Evidence of an act that is neither criminal nor overtly wrongful is still subject to the requirements of Rule 404(b) if the state introduces the evidence to prove that a defendant acted in conformity with a given character trait. See Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 908 (Tenn. 1996) (excluding evidence relating to carefulness); State v. James Robert Wilson, No. 02C01-9502-CC-00045 (Tenn. Crim. App., at Jackson, Dec. 1, 1997) (holding that Rule 404(b) is not limited to other crime evidence).

In the first appeal, our supreme court specifically addressed the admissibility of the pornographic magazines and videotapes discovered in the defendant's briefcase:

> The pornographic materials at issue here are of questionable relevance. Although the State promised to show the relevance of the evidence, it never did. Thus, while we suspect that it was error for the trial judge to permit the jurors to view the pornographic magazines and videotapes because they were unduly prejudicial, we cannot conclusively so find.

McCary, 922 S.W.2d at 515. Upon remand, the jury was not permitted to view the pornographic materials. Instead, the state admitted photocopies of the covers of each of the magazines and one of the videotapes.

In our view, the fact that the police discovered various pornographic media in the defendant's possession was probative as it tended to corroborate the account provided by each victim that the defendant used pornography as a means of seduction. Magazines and videotapes that each victim could identify as that the defendant kept in his briefcase would be relevant and not so prejudicial as

-12-

to preclude admission into evidence. The same conclusion cannot be reached with regard to those magazines and videotapes which could not be identified by either victim. Other than serving as "propensity" evidence, which would typically be inadmissible, those items would have little probative value and would likely engender substantial prejudice. Thus, the items should have been excluded. See Tenn. R. Evid. 404(b)(3). Even under the more stringent requirements of Tennessee Rule of Evidence 403, which requires that probative value be substantially outweighed by unfair prejudice before evidence will be excluded, pornographic magazines and videotapes not identified by either victim should not have been admitted. Given the defendant's admissions and overwhelming proof of his guilt, however, the error would classify as harmless. See Tenn. R. Crim. P. 36(b); Tenn. R. App. P. 52(a).

## II

The defendant next complains that the trial court erred by admitting irrelevant and prejudicial photographs of J.B. and J.S. He argues that the numerous photographs of each victim discovered in his office, which were not sexually suggestive or pornographic, should not have been admitted into evidence. The admissibility of photographs is governed by Tennessee Rule of Evidence 403. See State v. Banks, 564 S.W.2d 947 (Tenn. 1978). The evidence must be relevant and its probative value must outweigh any prejudicial effect. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

Here, upwards of one hundred photographs depicting each of the victims in any number of benign settings were apparently admitted to illustrate the defendant's preoccupation with them. While the sheer number of the photographs are suggestive, the content of the pictures do not otherwise have sexual overtones. It is our view that the trial court did not abuse its discretion by determining that the probative value of the photographs outweighed the slight potential for unfair prejudice. See Tenn. R. Evid. 403.

## III

The defendant also asserts that evidence seized from his office should have been excluded because the search warrant was invalid. He contends that the warrant failed to particularly describe the place to be searched or the items to be seized and that the affidavit accompanying the warrant should have specified the date on which the illegal activity was alleged to have occurred. Our supreme court has previously held that "when suppression of evidence seized pursuant to a search warrant is advocated, the burden is upon the accused to prove by a preponderance of the evidence: (1) the existence of a legitimate expectation of privacy in the place or property from which the items sought to be suppressed were seized; (2) the identity of the items sought to be suppressed; and (3) the existence of a constitutional or statutory defect in the search warrant or the search conducted pursuant to the warrant." State v. Henning, 975 S.W.2d 290, 298 (Tenn. 1998) (citing State v. Evans, 815 S.W.2d 503, 505 (Tenn. 1991); State v. Harmon, 775 S.W.2d 583, 585-86 (Tenn. 1989)).

The standard of review applicable to suppression issues is well established. When the trial court makes a finding of facts at the conclusion of a suppression hearing, the facts are accorded the weight of a jury verdict. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). The trial court's findings are binding upon this court unless the evidence in the record preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); see also Stephenson, 878 S.W.2d at 544; State v. Goforth, 678 S.W.2d 477, 479 (Tenn. Crim. App. 1984). Questions of credibility of witnesses, the weight and value of the evidence and resolution of conflicts in evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence. Odom, 928 S.W.2d at 23. This court's review of a trial court's application of law to the facts, however, is conducted under a de novo standard of review. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).

Both state and federal law require that a search warrant particularly describe the place to be searched. See U.S. Const., amend. IV; Tenn. Const., art. I, § 7; Tenn. Code Ann. § 40-6-103. Tennessee Rule of Criminal Procedure 41©) provides in part that "if the magistrate is satisfied that grounds for the application [for a search warrant] exist or that there is probable cause to believe that they exist, the magistrate shall issue a warrant identifying the property and naming or describing the person or place to be searched." In State v. Bostic, this court addressed the issue of what satisfies the "particular description requirement" of a search warrant:

> The Fourth Amendment to the United States Constitution requires a search warrant to contain a description of the place to be searched with such particularity that the searching officer may with reasonable effort ascertain and identify the intended place. Article I, Section 7 of the Tennessee Constitution prohibits general warrants and T.C.A. § 40-6-103 requires search warrants to describe particularly the property and the place to be searched. This requirement is met if the description "particularly points to a definitely ascertainable place so as to exclude all others, and enables the officer to locate the place to be searched with reasonable certainty, without leaving it to his discretion."

898 S.W.2d 242, 245-46 (Tenn. Crim. App. 1994) (quoting State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993), cert. denied, 513 U.S. 960 (1994)). The particularity requirement is satisfied if the place to be searched is described in such a manner that the officer conducting the search of the premises of one person under a warrant would be prevented from searching instead the premises of another person. See State v. Cannon, 634 S.W.2d 648, 650 (Tenn. Crim. App. 1982) (citing Lea v. State, 181 Tenn. 378, 181 S.W.2d 351 (1944)). A correct street address in a search warrant, even if no other description is given, may be particular enough to withstand constitutional scrutiny. See United States v. Dancy, 947 F.2d 1232, 1234 (5th Cir. 1991).

Citing State v. Bass, 281 S.W.2d 936 (Tenn. 1926), the defendant asserts that because Central Baptist Church is composed of more than one building located at the same street address, the

particularity requirement was not fulfilled. In Bass, our supreme court observed that "[a]s a matter of course . . . if there be more than one building located at the designated street number, . . . reference to the street number would not afford an accurate description of the premises to be searched." Id. at 937. Our high court added that "[a] broad statement of the general rule . . . is that the description is sufficient which enables the officer to locate the place to be searched with reasonable certainty without leaving to his discretion the choice between one or more places occupied by strangers to the process." Id.; see also Worden v. State, 273 S.W.2d 139, 141 (Tenn. 1954). The state asserts that because the multiple buildings located at 5208 Hixson Pike were all part of Central Baptist Church and not "places occupied by strangers," Bass is inapplicable.

Initially, the warrant provided the correct street address for Central Baptist Church, where the defendant's office was located. The affidavit accompanying the search warrant specifically identified the defendant's office at the church as subject to search. While several buildings are located at the street address contained in the search warrant, all of the buildings comprise Central Baptist Church. None qualify as premises "occupied by strangers," the concern expressed in Bass.

The defendant also contends that the search warrant is invalid because it fails to particularly describe the items to be seized, making it an illegal general warrant. To be valid under the Fourth Amendment to the United States Constitution, a search warrant must contain a particular description of the items to be seized. See Marron v. United States, 275 U.S. 192 (1927). Similarly, Article I, section 7 of the Tennessee Constitution prohibits general warrants and Tennessee Code Annotated § 40-6-103 specifically requires that search warrants describe the property to be seized with particularity. See Lea v. State,181 Tenn. at 382-83, 181 S.W.2d at 352-53; Hampton v. State, 148 Tenn. 155, 252 S.W. 1007 (1923).

To satisfy the particularity requirement, a warrant "'must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized.'" State v. Meeks, 867 S.W.2d 361, 371 (Tenn. Crim. App. 1993) (quoting United States v. Cook, 657 F.2d 730, 733 (5th Cir. 1981)). In Lea, our supreme court observed as follows:

> Where the purpose of the search is to find specific property, it should be so particularly described as to preclude the possibility of seizing any other. On the other hand, if the purpose be to seize not specified property, but any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such character, place and circumstances, would be unnecessary, and ordinarily impossible.

181 Tenn. at 382-83, 181 S.W.2d at 352-53.

Here, the warrant describes the items to be seized as "evidence which points to the existence of an unlawful sexual relationship or the commission of a sexual crime between [the defendant], Informant D, and/or other juvenile or males" and then provides a list of items that might qualify. The

-15-

warrant specifically authorizes the seizure of the defendant's red briefcase. In our view, the warrant describes the character of the property subject to seizure with sufficient particularity "to enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." See State v. Melson, 638 S.W.2d 342, 353 (Tenn. 1982); State v. Meadows, 745 S.W.2d 886, 891 (Tenn. Crim. App. 1987). The warrant is not so general as to preclude the admission of the items seized by police.

Finally, the defendant asserts that the search warrant is invalid because the affidavit in support of the search warrant does not set forth the date on which the crimes were alleged to have occurred. The state argues that no specific date of offense was required under the circumstances.

In State v. Baker, this court concluded that "the absence of a specific date in the affidavit setting out when the illegal activity was observed is not required if the affidavit sets out sufficient facts from which the magistrate issuing the warrant could find probable cause to believe the illegal activity, or other matters justifying a search, are occurring or are present on the premises when the search warrant is issued." 625 S.W.2d 724, 726 (Tenn. Crim. App. 1981), overruled on other grounds by State v. Holt, 691 S.W.2d 520, 522 (Tenn. 1984). The existence of probable cause is to be determined on a case-by-case basis and, when making the probable cause determination, "the issuing magistrate should consider whether the criminal activity under investigation was an isolated event or of a protracted and continuous nature, the nature of the property sought, and the opportunity those involved would have had to dispose of incriminating evidence." State v. Meeks, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993) (citing United States v. Steeves, 525 F.2d 33, 38 (8th Cir. 1975); W. LaFave & J. Israel, Criminal Procedure § 3.3(g) (2d ed. 1992)).

Here, the affidavit accompanying the search warrant contained information that "for some months [the defendant] has been engaging in sexual contact with [Informant D]" and that the defendant "keeps pornographic material . . . in his car, and in a red or burgundy briefcase with a combination lock, and at Central Baptist Church, and at [the defendant's] home." These statements allege illegal activity that is of a continuing nature. Under these circumstances, the lack of a specific date in the affidavit would not render the warrant invalid.

In a related issue, the defendant claims that the search of his office was invalid because the officers failed to knock and announce their presence before entering the church. It is well settled that before an officer may make a forced entry into an occupied residence, the officer must give "notice of his authority and purpose." Tenn. R. Crim. P. 41(e); State v. Fletcher, 789 S.W.2d 565, 566 (Tenn. Crim. App. 1990). In State v. Lee, 836 S.W.2d 126, 128 (Tenn. Crim. App. 1991), this court adhered to the rule, directing that officers must, before entering a residence, identify themselves as law enforcement officials and then explain the purpose of their presence. If not admitted after having given this notice, the officer is authorized to "break open any door or window . . . or any part thereof, . . . to the extent that it is reasonably necessary to execute the warrant and does not unnecessarily damage the property." Tenn. R. Crim. P. 41(e).

The purpose of the "knock and announce" rule is described in United States v. Moreno, 701 F.2d 815 (9th Cir. 1983). First, it provides protection from violence, ensuring the safety and security of both the occupants and the entering officers. Second, it protects "'the precious interest of privacy summed up in the ancient adage that a man's house is his castle.'" Id. at 817 (quoting Miller v. United States, 357 U.S. 301, 301 (1958)). Finally, it protects against the needless destruction of property. Id. at 817. Typically, officers must "wait a reasonable period of time before [they] may break and enter into the premises to be searched." State v. Carufel, 314 A.2d 144, 146 (R.I. 1974). Compliance is not required if knocking and announcing would increase the officer's peril, or if an officer executing a warrant perceives indications of flight or indications that evidence is being destroyed. State v. Henning, 975 S.W.2d 290, 299-300 (Tenn. 1998). If an officer executing a warrant observes indications of flight or destruction of evidence, there are exigencies excusing the "knock and announce" rule. State v. Fletcher, 789 S.W.2d 565 (Tenn. Crim. App. 1990).

Here, officers observed the defendant carrying the red briefcase when they arrived to execute the search warrant. When Detective Rawlston asked to speak with the defendant, he ran into the church and hid under some choir robes. Under these circumstances, compliance with the "knock and announce" rule was not required.

**IV**

As his next issue, the defendant contends that the trial court erred by refusing to suppress those statements the defendant made during the search of his office and the comments he made to his wife over the telephone. The defendant claims that those statements he made during the search of his office qualify as the fruit of the illegal search. Because the admissibility of the defendant's statements during the search is dependent upon the validity of the search warrant and because the search was lawful, as previously indicated, the statements made during the search were properly entered into evidence. See generally Wong Sun v. United States, 371 U.S. 471, 484 (1963). The unresolved issue is whether the statements made during the search of his office were the product of an unlawful custodial interrogation. The state asserts that the defendant was not "in custody" when the statements were made. The state also submits that the defendant had been advised of his rights under Miranda prior to any questioning.

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself ." U.S. Const. amend. V; see also Malloy v. Hogan, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent makes a custodial interrogation. Statements made during

the course of a custodial police interrogation are inadmissible at trial unless the state establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. Miranda v. Arizona, 384 U.S. 436, 471-75 (1966); see also Dickerson v. United States, 530 U.S. 428, 444 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 478; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In order to effect a waiver, the accused must be adequately apprised of his right to remain silent and the consequence of deciding to abandon the right. State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994). In determining whether a confession was voluntary and knowing, the totality of the circumstances must be examined. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). If the "greater weight" of the evidence supports the court's ruling, it will be upheld. Id. This court must conduct a de novo review of the trial court's application of law to fact. State v. Bridges, 963 S.W.2d 487 (Tenn. 1997); State v. Yeargan, 958 S.W.2d 626 (Tenn. 1997).

In Miranda, the United States Supreme Court limited its holding to a "custodial interrogation." Miranda, 384 U.S. at 478-79. The Court defined the phrase "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444. A person is "in custody" within the meaning of Miranda if there has been "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (citation omitted). The Court has refused to extend the holding in Miranda to non-custodial interrogations. See Oregon v. Mathiason, 429 U.S. 492 (1977) (holding that an accused's confession was admissible because there was no indication that the questioning took place in a context where his freedom to depart was restricted in any way); see also Beheler, 463 U.S. at 1124-25 (noting that the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest). In determining whether a reasonable person would consider himself or herself in custody, our supreme court considers a variety of factors, including the following:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

State v. Walton, 41 S.W.3d 75, 82-83 (Tenn. 2001) (quoting State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996)).

Here, Detective Rawlston informed the defendant that he was not under arrest and explained that the officers were at the church to execute the search warrant. The proof established that while Detective Rawlston asked the defendant to stay during the search, he did not force him to do so. Later, the defendant was permitted to leave and return to his residence. Detective Rawlston confirmed that the defendant's freedom of movement was limited inside the church office in an effort to prevent any destruction of evidence. The defendant was not permitted to move his car because it was subject to search under the warrant. By the application of each of the pertinent factors, it is our view that the trial court did not err by finding that the defendant was not in custody when he made statements at the scene of the search. Further, the statements made by the defendant during the search of his office were not prompted by police questioning. Finally, even assuming that the defendant was in custody, suppression would not be required because Detective Rawlston informed the defendant of his <u>Miranda</u> rights and the defendant indicated an understanding of those rights. In our view, the motion to suppress the statements the defendant made during the search of his office was properly denied.

The defendant also asserts that his comments to his wife over the telephone at the police station should have been suppressed because Detective Mathis' transcription of his conversation violated his right to privacy, his privilege against self-incrimination, and his right to counsel. The United States Supreme Court has stated that "it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." <u>Lanza v. New York</u>, 370 U.S. 139, 143 (1962). Further, this court has ruled that a defendant does not have a reasonable expectation of privacy while on a jailhouse telephone. <u>State v. Eddie Erwin</u>, E2000-00989-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Apr. 2, 2001).

The defendant was granted permission to telephone his wife from an office in the major crimes division at the Chattanooga Police Department. During the conversation, Detective Mike Mathis stood at the door to the office and took notes. The defendant was fully aware of Detective Mathis' presence and he informed his wife that the detective was taking notes of the conversation. The defendant also told his wife that the notes would likely be used against him in any trial. None of the statements admitted at trial were the product of police interrogation. Under these circumstances, the trial court did not err by refusing to suppress the statements.

## V

The defendant next challenges the propriety of a number of comments made by the special prosecutor during the closing argument at each of the two trials. Specifically, he argues that the prosecutor made improper religious references during both closing arguments. The state asserts that the defendant has waived this issue by failing to support it with argument and by failing to make a contemporaneous objection. The state also asserts that because the numerous religious references were made in response to the defendant's own religious references, any error would have to be classified as harmless.

Trial courts have substantial discretionary authority in determining the propriety of final argument. Although counsel is generally given wide latitude, courts must restrict any improper

argument.  <u>Sparks v. State</u>, 563 S.W.2d 564 (Tenn. Crim. App. 1978).  Generally speaking, closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried."  <u>State v. Sutton</u>, 562 S.W.2d 820, 823 (Tenn. 1978). For example, our supreme court has ruled that argument that "that defense counsel was 'trying to throw sand in the eyes of the jury' and 'blowing smoke in the face of the jury'" is improper argument. <u>State v. West</u>, 767 S.W.2d 387, 395 (Tenn. 1989).  To merit a new trial, however, the argument must be so inflammatory or improper as to affect the verdict.  <u>Harrington v. State</u>, 215 Tenn. 338, 385 S.W.2d 758 (1965).  In <u>Judge v. State</u>, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court articulated the factors to be considered in making that determination:

> (1) the conduct complained of viewed in the context and the light of the facts and circumstances of the case;
> (2) the curative measures undertaken by the court and the prosecution;
> (3) the intent of the prosecutor in making the improper statements;
> (4) the cumulative effect of the improper conduct and any other errors in the record; and
> (5) the relative strength or weakness of the case.

It is well established in Tennessee that references to Biblical passages or religious law during a criminal trial are inappropriate.  <u>See</u> <u>State v. Stephenson</u>, 878 S.W.2d 530, 541 (Tenn. 1994) (judge's references to Biblical passage); <u>Kirkendoll v. State</u>, 198 Tenn. 497, 281 S.W.2d 243, 254 (1955) (prosecutor's reference to religious law).  While there may be argument about any reasonable inferences from the evidence, prosecutors should avoid classification of the defendant as a "bad person" who should be convicted on general principles for the good of society.  <u>Knight v. State</u>, 229 S.W.2d 501 (1950).  Most restrictions during final argument are placed upon the state.  That is based in great measure upon the role of the prosecutor in the criminal justice system.

> [The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the two fold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor, indeed he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.  It is fair to say that the average jury, in a greater or lesser degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed.  Consequently, improper suggestions, insinuations, and especially assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935); see also Judge v. State, 539 S.W.2d 340, 344-45 (Tenn. Crim. App. 1976).  Thus, the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial.  The prosecutor must not express a personal belief or opinion, but whether that qualifies as misconduct often depends upon the specific terminology used.  For example, argument predicated by the words "I think" or "I submit" does not necessarily indicate an expression of personal opinion.  United States v. Stulga, 584 F.2d 142 (6th Cir. 1978).  Comments should not reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial.  See Dupree v. State, 219 Tenn. 492, 410 S.W.2d 890 (1967); Moore v. State, 159 Tenn. 112, 17 S.W. 30 (1929); Watkins v. State, 140 Tenn. 1, 203 S.W. 344 (1918); McCracken v. State, 489 S.W.2d 48 (Tenn. Crim. App. 1972).  Although there may be no commentary on the consequences of an acquittal, the prosecution may point out the gravity of a particular crime and emphasize the importance of law enforcement.  See State v. Dakin, 614 S.W.2d 812 (Tenn. Crim. App. 1980); Bowling v. State, 3 Tenn. Crim. App. 176, 458 S.W.2d 639 (1970).

During the trial of the offenses committed against J.S., the special prosecutor argued, in pertinent part, as follows:

> You have come closer to evil than you ever will in your whole life.  You have come within 25 feet of evil.  Closer than you will ever in your whole life.
> Don McCary's life has been nothing but a fraud, nothing but a fake, a total sickness in his mind.  But the good thing about this case, if there is a good thing, is that youth has grown to manhood and stood up and spit in his face.
>      *               *               *
> It's sad and destructive, but [J.S.] did grow up, and thank God he did.
>      *               *               *
> [W]hen that's done, that child won't be in the clutches of the demon anymore, and no other child [will be] within the clutches of the demon.
> As we see on the screen, that 14-, 13-, 15-year-old boy was in the clutches of the demon.  Look at him holding him, grasping him, deceiving youth.
>      *               *               *
> It offends me, as it should you, that Mr. McCary . . . wraps himself in the Bible before you.  He quotes Proverbs, he's quoted other passages.  He talks about not hearing the other side of the story so that the path can be straight.
> Mr. McCary may very well be damned by God for the rest of eternity for that, wrapping himself in the Bible between you and us[.]
>      *               *               *
> And this child embraced the Lord and embraced the word of God and tried to grow.  And in the child's growth, he met Don McCary.  It is the word of the Lord that this child was learning and that this man was corrupting, and that is what happened to this child.

In our view, these arguments, replete with inappropriate religious references, were improper.  Moreover, although this court had previously warned the state about the improprieties during the

-21-

direct appeal of the defendant's 1992 convictions, see State v. Donald C. McCary, No. 03C01-9303-CR-00103 (Tenn. Crim. App., at Knoxville, May 11, 1994) (Wade, J., dissenting), the special prosecutor nevertheless chose to repeat them. Whether the defendant should be "damned for eternity" is the exclusive jurisdiction of a far greater authority than the state courts. Legal precedent establishes that references to the defendant as "a demon" or comments that the jury had, by observing the defendant, "come within twenty-five feet of evil" personified are inappropriate. Argument expressing the special prosecutor's personal opinion that the defendant's life was "nothing but a fake, a fraud, a total sickness in his mind" should have been avoided.

Most troubling is the prosecutor's reference to the defendant's sexual abuse of Travis Joins:

> And you remember Travis's [sic] testimony yesterday when he was at this witness stand and he was just bursting at the seams to say something? And I, I didn't let him continue.
>
>          *                       *                      *
>
> And Travis testified, but this isn't about Travis' trial. This isn't about what happened to Travis. And you'll know, I very carefully stayed away from that even after he blurted things out to Mr. McCary. Even after Mr. McCary challenged him to be an accessory of the fact. You'll deal in a different Court of law for anything you did to Travis. This is about [J.S.].

No evidence of sexual crimes committed by the defendant against Travis Joins was introduced at the trial. In fact, because such evidence was improperly admitted in the first trial, our supreme court reversed the defendant's convictions. Nevertheless, the prosecutor, by including these comments in his argument, implied that the defendant had also committed crimes against Joins. Considering the wealth of evidence incriminating the defendant on each of the charges, it is especially difficult to understand why the prosecutor deemed it necessary to resort to that strategy. Apparently, the admonitions of our supreme court had little effect on the tactics utilized in the J.S. trial. Although there was significant proof of the defendant's guilt, it is our view that the comments made during the state's closing argument at the trial involving J.S. were so improper and inflammatory that a new trial is warranted. See Harrington, 385 S.W.2d at 759. In consequence, the defendant's convictions for the sexual battery and statutory rape of J.S. must be reversed and the cause remanded for a new trial.

The prosecutor's final argument at the trial of the offenses involving J.B. provide a much closer question. At the conclusion of that trial, the prosecutor made the following remarks:

> You've been able to crawl into the mind of Don McCary and let him tell you exactly how he felt, exactly what was driving him exactly what was going on: his jealousy for [J.B.], his uncontrolled passion for [J.B.], his filth and rot.
>
>          *                       *                      *
>
> We as adults cannot allow that to happen. Take the young boy's trust, do everything with it, put him in a position, build your own life in a position of faith and

trust and betray it all, betray our family, betray God, betray that young boy. That's what we see.

You know, the good thing that comes out of this case is that when you first hear it, your faith is just shaken. You wonder, How can God allow this to happen in His church, it happen at all, but in His church with a pastor. How can everybody in that church miss it? How can this poor young boy be put in that position so that perhaps for a year of his life he thinks about killing himself?

But my faith is stronger because of this. I watched the travel of that little tape, I watched that tape and how at any time it could have been erased, how Ron Benefield could have not found it. How it could have continued, how the mother may not have listened to it, but my faith is really strong and bounds forward because of the process that we say in this very courtroom today.

     *        *        *

For some reason, my faith walks through this case and . . . watches as the evidence developed.

In our view, the special prosecutor's remarks, although more subtle than those made during the closing argument of the trial involving J.S., qualified as erroneous. The prosecutor argued, in effect, that the defendant should be convicted because he is an immoral person who betrayed God by defiling J.B. While the fervor of the prosecution is perfectly understandable given the circumstances of the offenses, juries are urged by the instructions to exercise reason, not passion, anger, or retribution. Also inappropriate was the insinuation that the prosecution of the defendant has somehow been blessed by the hand of God or that God himself had guided the micro-cassette into the hands of Ron Benefield. At no time did he submit that the defendant should be convicted of aggravated sexual battery for touching J.B. Instead, he argued exclusively that the defendant deserved conviction because of his hypocrisy and his immorality.

There were no curative measures. The jury was not directed to disregard the overzealous remarks made during final argument. Because the state had been forewarned of the potential impropriety of parts of the argument, the special prosecutor knew or should have known to limit the argument to the proof offered at trial and to avoid personal opinion or provocative references to the immorality of the defendant. Those are two factors which would warrant reversal. The question at issue was whether the defendant had committed the crimes charged in the indictment and nothing more. There was substantial proof of the defendant's guilt. The testimony of J.B. was largely uncontroverted. The defendant generally admitted wrongdoing in the presence of police. There was other incriminating evidence. The final argument, although designed to elicit an emotional response from the jurors, must be assessed in the context of the facts presented at trial, which were indicative of guilt. Because the state's case against the defendant in the crimes involving J.B. was strong and there were no other significant errors at trial, three of the five factors identified in <u>Judge</u> weigh favorably for the state. It is our view that the improper comments during closing argument were inflammatory and improper, but not to such a degree as to affect the verdict. <u>See</u> <u>Harrington</u>, 385 S.W.2d at 759.

-23-

## VI

The defendant also claims that the trial court erred by permitting him to represent himself at each of the trials. Every person has a constitutional right to represent himself. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; Faretta v. California, 422 U.S. 806, 818-820 (1975). In State v. Herrod, 754 S.W.2d 627 (Tenn. Crim. App. 1988), this court ruled that the exercise of the right of self-representation is based upon three conditions:

(1) The defendant must timely assert his right to self-representation;
(2) the exercise of the right must be clear and unequivocal; and
(3) the defendant must knowingly and intelligently waive his right to assistance of counsel.

Id. at 629-30. A defendant need not have legal training or experience in order to competently and intelligently elect self-representation. Faretta, 422 U.S. at 835.

When an accused desires to proceed pro se, the trial judge must conduct an intensive inquiry as to his ability to represent himself. State v. Northington, 667 S.W.2d 57, 61 (Tenn. 1984). The waiver of the right to counsel must be knowingly and intelligently made. Tenn. R. Crim. P. 44; State v. Armes, 673 S.W.2d 174, 177 (Tenn. Crim. App. 1984). In Johnson v. Zerbst, 304 U.S. 458, 46 (1938), the United States Supreme Court placed "the serious and weighty responsibility . . . of determining whether there is an intelligent and competent waiver" directly upon the trial judge. In a subsequent case, more specific guidelines were established:

A judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.

Von Moltke v. Gillies, 332 U.S. 708, 723-23 (1948). Rule 44 of the Tennessee Rules of Criminal Procedure places a similar obligation on the trial court:

Every indigent defendant shall be entitled to have counsel assigned to represent him in all matters necessary to his defense and at every stage of the proceedings, unless he executes a written waiver. Before accepting such waiver the court shall first advise the accused in open court of his right to the aid of counsel in every stage of the proceedings. The court shall, at the same time, determine whether there has been a

-24-

competent and intelligent waiver of such right by inquiring into the background, experience and conduct of the accused and such other matters as the court may deem appropriate. Any waiver shall be spread upon the minutes of the court and made a part of the record of the cause.

Tenn. R. Crim. P. 44(a); see also State v. Gardner, 626 S.W.2d 721, 723 (Tenn. Crim. App. 1981).

In Northington, our supreme court held that the trial court had "wholly failed to properly investigate [whether] the defendant understood the consequences of self-representation in light of the Von Molke factors." 667 S.W.2d at 61 (internal quotation marks omitted). The trial court had addressed the seriousness of the charges, had advised that a pro se defendant would be held to the same standard as a lawyer, and was assured that the pro se defendant had discussed the case with his appointed attorney. Id. at 59. The age and education of the accused was also determined in advance of the acceptance of the waiver of the right to counsel. Id. The trial court had warned the defendant that proceeding pro se was unwise. Id. Our supreme court set aside the conviction because the trial court "failed to diligently examine the defendant's background and experience, failed to notify defendant as to the possible extent of any penitentiary sentence, and failed to elaborate fully to defendant why he thought it 'unwise' to waive counsel." Id. at 61.

In State v. Goodwin, 909 S.W.2d 35, 41 (Tenn. Crim. App. 1995), a panel of this court ruled that Goodwin had validly waived his right to counsel. In that case, the trial court inquired as to Goodwin's age and education and warned him that proceeding pro se would cause confusion. Id. at 40. Goodwin was informed that an attorney would be provided for him for pretrial proceedings through an appeal, if needed. Id. He was warned that if he waived counsel, he would not have access to a law library and that his advisory counsel was not required to provide him with photocopies of relevant legal materials. Id. The trial judge told him that the trial would proceed at the same pace as it would if he had appointed counsel, that he would not have an opportunity to confer with advisory counsel for every question, and that he was responsible for understanding the rules of evidence and local rules of court. Id. at 41. The trial judge informed Goodwin that, as a litigant, he would have "no greater right than any other litigant" and that he would be treated the same as if he were represented by counsel. On appeal, this court concluded that the trial court is not required to interrupt the trial to explain procedural rules, legal terms, or consequences of the litigant's actions and ruled that Goodwin "clearly understood the hazards of representing himself." Id.

Here, the trial court conducted a lengthy hearing to ascertain whether the defendant was competent to represent himself at trial. The trial court informed the defendant of his right to counsel and warned against the perils of proceeding pro se. The defendant acknowledged that he was facing a sizable sentence if convicted and expressed complete awareness that the trial court could order the sentences to be served consecutively. The trial court advised the defendant that he would not be given any special rights, but would instead be expected to proceed as any other litigant. Warning that the defendant would receive no legal advice from the court, the defendant was offered the

services of his previous counsel, Richard Heinsman, as "elbow" counsel.[5] The defendant, who had obtained bachelor's and master's degrees before becoming a minister, accepted the offer and informed the trial court that he had taken a correspondence course to become a paralegal while incarcerated and had become quite familiar with the rules of evidence and procedure. In our view, the trial court did not err by permitting the defendant to represent himself. That was his right.

## VII

The defendant next contends that the trial court erred by refusing to rule that he was incompetent to stand trial. In Dusky v. United States, 362 U.S. 402 (1960), the Supreme Court ruled that the defendant is competent if he has sufficient ability to consult with his lawyer with a reasonable degree of rational understanding and a reasonable and factual understanding of the proceedings. In Mackey v. State, 537 S.W.2d 704 (Tenn. Crim. App. 1975), this court determined that the defendant must be able to understand the nature and objects of the proceedings against him, must be able to consult with counsel, and must be able to assist in the preparation of his defense.

The burden is on the defendant to establish his incompetency to stand trial by a preponderance of the evidence. State v. Oody, 823 S.W.2d 554 (Tenn. Crim. App. 1991). The determination of competency is within the sound discretion of the trial court. State v. Howard, 926 S.W.2d 579 (Tenn. Crim. App. 1996). Where the trial judge failed to conduct an evidentiary inquiry, the question on appeal is whether he should have experienced doubt with respect to the defendant's competency to stand trial. Berndt v. State, 733 S.W.2d 119,122 (Tenn. Crim. App. 1987).

---

[5]"Elbow counsel," "standby counsel," "advisory counsel," and "arm chair counsel" are terms used interchangeably. In Smith v. State, 757 S.W.2d 14 (Tenn. Crim. App. 1988), this court rejected "as totally unfounded" the concept of "elbow counsel." Quoting State v. Burkhart, 541 S.W.2d 365 (Tenn. 1976), this court observed as follows:

> The right of a defendant to participate in his own defense is an alternative one. That is, one has a right either to be represented by counsel or to represent himself, to conduct his own defense. . . . It is entirely a matter of grace for a defendant to represent himself and have counsel, and such privilege should be granted by the trial court only in exceptional circumstances.

In Smith, this court at least recognized the concept of "standby counsel," which was described as allowing the defendant to conduct his own defense accompanied by the largess of the trial court in providing a lawyer with whom to confer. A defendant has no constitutional right, of course, to act as co-counsel when he is represented by counsel. State v. Franklin, 714 S.W.2d 252 (Tenn. 1986). Before a trial court may allow a defendant to participate in a dual representation, there must be a determination that the defendant (a) is not seeking to destruct orderly trial procedure and (b) that the defendant has the intelligence, ability, and general competence to participate in his own defense. Burkhart, 541 S.W.2d at 371. Even if both factors are satisfied, the trial judge may nevertheless decline to permit dual representation. State v. Franklin, 714 S.W.2d at 261. In State v. Small, 988 S.W.2d 671 (Tenn. 1999), our supreme court held that the decision whether to appoint advisory counsel to assist a pro se defendant rests entirely within the discretion of the trial court, who should make the determination based "upon the nature and gravity of the charge, the factual and legal complexity of the proceedings, and the intelligence and legal acumen of the defendant." Id. at 674.

Here, the defendant did not challenge his competency to stand trial. Moreover, the record reflects that the defendant had the ability to articulate his thoughts and the rationality to understand the rulings of the court. As his own advocate, he exhibited intelligence as he endeavored to serve as his own counsel. Although testimony provided by friends of the defendant at the hearing on the motion for new trial suggests that the performance of the defendant may have been affected by the anxiety associated with being on trial, control over emotions is not required. That the defendant was nervous or fearful prior to or during each of the trials does not establish that he was incompetent to stand trial. In our view, the trial court did not abuse its discretion by failing to <u>sua sponte</u> declare the defendant incompetent to stand trial.

## VIII

The defendant next asserts that the trial court erred by failing to dismiss the original indictments for failure to state a criminal offense. In a related issue, he claims that the trial court erred by permitting the state to amend the indictments after remand from the supreme court because the statute of limitations had expired. The state argues that the indictments as originally returned were sufficient to state a criminal offense. Further, the state contends that, although it appears that the indictments were never actually amended, amendment was permissible because the amendments did not allege a new or different offense.

While the state moved to amend the indictments prior to trial, both orally and by written motion, no order of the trial court granting the motion appears in the record. It does appear, however, that the trial court orally granted the motion to amend. The wording of the indictments as read to the jury, however, is the same as that contained in the original indictments and not as that contained in the motion to amend.

The defendant claims that the indictments fail to state a criminal offense because they do not allege a culpable mental state. Generally, an indictment must set forth the elements of the offense. <u>State v. Perkinson</u>, 867 S.W.2d 1, 5 (Tenn. Crim. App. 1992). It is settled law that "when the indictment or presentment fails to fully state the crime, all subsequent proceedings are void." <u>Id.</u> (citing <u>State v. Morgan</u>, 598 S.W.2d 796, 797 (Tenn. Crim. App. 1979)). In <u>State v. Hill</u>, 954 S.W.2d 725 (Tenn. 1997), our supreme court established the criteria to determine whether an indictment performs its essential constitutional and statutory purposes. In <u>Hill</u>, the high court held that for offenses which neither expressly require nor plainly dispense with the requirement for a culpable mental state, an indictment which fails to allege such mental state will be sufficient to support prosecution and conviction for that offense so long as (1) the language of the indictment is sufficient to meet the constitutional requirements of notice to the accused of the charge against which the accused must defend, adequate basis for entry of a proper judgment, and protection from double jeopardy; (2) the form of the indictment meets the requirements of Tennessee Code Annotated section 40-13-202; and (3) the mental state can be logically inferred from the conduct alleged. <u>Id.</u> at 726-27. Our high court affirmed the validity of the indictment in <u>Hill</u>, which charged that the defendant "unlawfully" penetrated the victim, who was less than thirteen years old. In <u>Ruff v. State</u>, 978 S.W.2d 95, 96-97 (Tenn. 1998), our supreme court applied the <u>Hill</u> analysis to determine whether an indictment for aggravated sexual battery was sufficient. Our high court held that "the

-27-

intentional nature of aggravated sexual battery may be inferred from the conduct alleged in the indictment--unlawful sexual contact." Id. at 97.

The offenses with which the defendant was charged neither expressly require nor plainly dispense with a required mental state. In our view, the culpable mental state for statutory rape, aggravated sexual battery, and sexual battery can be logically inferred from the conduct alleged. Moreover, our supreme court recently ruled that an indictment which makes reference to the applicable statute will serve as satisfactory notice. State v. Sledge, 15 S.W.3d 93, 95 (Tenn. 2000); see also State v. Carter, 988 S.W.2d 145 (Tenn. 1999). Here, there was a statutory reference in each indictment. The mental state can be logically inferred, even from the unamended form of the indictments. It is our view that the indictments satisfy the standards established by our supreme court.

## IX

Next, the defendant asserts that the trial judge erred by failing to recuse himself from hearing the motions for new trial. Specifically, he claims that the trial judge was not impartial because he participated in the plea negotiations. Whether recusal is necessary, based upon the alleged bias or prejudice of the trial judge, rests within the discretion of the trial court. Caruthers v. State, 814 S.W.2d 64, 67 (Tenn. Crim. App. 1991). A judge should grant a motion for recusal whenever his or her "impartiality might reasonably be questioned." Code of Judicial Conduct, Canon 3(E)(1); see State v. Jimmy D. Dillingham, No. 03C01-9110-CR-00319 (Tenn. Crim. App., at Knoxville, February 3, 1993). This court will not interfere with the trial court's discretion unless clear abuse appears on the face of the record. Caruthers, 814 S.W.2d at 67.

At the hearing on the recusal motion, Rich Heinsman, who served as "elbow" counsel during the trials and who represented the defendant when the defendant pled guilty to three counts of rape of M.C. and two counts of assault against C.R., testified that he had approached the state in an effort to reach an agreement providing that the sentences imposed in the cases where the defendant pled guilty would be served concurrently with the sentences he received in the trials. When the assistant district attorney indicated that the state was unwilling to enter into an agreement for concurrent sentencing, Attorney Heinsman, apparently with the permission of the assistant district attorney, telephoned the trial judge in an effort to ascertain his position on concurrent sentences. Attorney Heinsman testified that the trial judge advised that he was "inclined" to grant concurrent sentences, but warned that he could not make a definite determination until after the sentencing hearing.

Tennessee Rule of Criminal Procedure 11 provides, in pertinent part, as follows:

The district attorney general and the attorney for the defendant or the defendant when acting pro se may engage in discussions with a view toward reaching an agreement that, upon the entering of a plea of guilty or nolo contendere to a charged offense or to a lesser or related offense, the district attorney general will do any of the following:
     (A) move for dismissal of other charges; or

(B) make a recommendation, or agree not to oppose the defendant's request, for a particular sentence, with the understanding that such recommendation or request shall not be binding upon the court; or

(C) agree that a specific sentence is the appropriate disposition of the case. The court shall not participate in any such discussions.

Tenn. R. Crim. P. 11(e)(1) (emphasis added). During the hearing on the motion requesting recusal, the trial judge expressed the view that his comments did not qualify as participation in plea discussion. Because the trial court made no commitment or promise serving to influence the plea negotiations, recusal was not required.

## X

The defendant also claims that the cumulative effect of the errors at each trial denied him the right to a fair trial and violated his due process rights. Because we have determined that other errors at trial require the reversal of the defendant's convictions, it is not necessary to determine whether the cumulative effect of the errors requires reversal.

## CONCLUSION

Because the state failed to make an election of offenses at the trial involving J.S., the defendant's convictions for the sexual battery and statutory rape of J.S. must be reversed and the cause remanded for a new trial. In addition, because the prosecutor's comments during closing argument in that trial were improper, and because the error does not qualify as harmless, the defendant's convictions for charges involving J.S. are reversed, new trials granted, and the cause remanded. With regard to the trial involving J.B., the state was not required to elect between offenses because the only offenses proved were those contained in the indictment. While improper, the final argument in that trial was not so inflammatory as to affect the verdict. Accordingly, the defendant's convictions for the aggravated sexual battery of J.B. are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE