# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 27, 2011 Session

## STATE OF TENNESSEE v. MARGARET L. HOLT

**Direct Appeal from the Circuit Court for Jefferson County**
**No. 10059     O. Duane Slone, Judge**

---

**No. E2010-02128-CCA-R3-CD - Filed March 13, 2012**

---

The Defendant-Appellant, Margaret L. Holt, was convicted by a Jefferson County jury of attempted statutory rape by an authority figure, a Class D felony, and statutory rape by an authority figure, a Class C felony. The trial court sentenced her as a Range I, standard offender to concurrent sentences of three years in the Tennessee Department of Correction. On appeal, Holt argues: (1) the trial court erred in admitting evidence of a note and a kiss between her and one of the victims, and (2) the evidence was insufficient to support her convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined, and J. C. MCLIN, J., (Mortuus).

Eric Lutton and Keith E. Lowe, Knoxville, Tennessee, for the Defendant-Appellant, Margaret L. Holt.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; James B. Dunn, District Attorney General; and Jeremy D. Ball, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

The convictions in this case arose as a result of Holt, a teacher's assistant at Jefferson High School, engaging in or attempting to engage in sexual intercourse with two of her

students, A.B.[1] and J.M.  Prior to trial, Holt moved to exclude a note and a kiss pursuant to Rule 404(b) of the Tennessee Rules of Evidence.

**Rule 404(b) Hearing.**  A.B., age sixteen, identified a note that he received from Holt which stated, "I wish you could spend the night with me this weekend[,] but I understand that you can't." A.B. said he responded to the note by writing, "It ain't 'cause [sic] of my dad, it's because of my girlfriend, and I'm not going to cheat on her." A.B. gave the note back to Holt, and she responded by writing, "[O]kay[,]" before giving the note back to A.B.  A.B. stated he provided this note to Detective Kearney during his interview regarding this case.[2]

On cross-examination, A.B. admitted he did not know the date that he received the note from Holt.  He also acknowledged he did not remember whether he received the note before or after he allegedly had sexual intercourse with Holt; however, he did recall that he received the note from Holt close to the time that he and Holt had intercourse.

Charles Ruth, age twenty-seven, testified he had known A.B. for approximately four or five years.  Ruth stated he drove A.B. to meet Holt in the fall of 2008.  Once they arrived at Holt's home, Holt came outside and told A.B. that she was seeing another student and had bought that student drinks at a bar.  Ruth said that Holt then walked around to the passenger side, opened the door, and "pulled [A.B.] to her and gave him a big ole [sic] kiss" on the mouth.

On cross-examination, Ruth admitted he did not remember the exact date that he took A.B. to Holt's home.  Ruth said he was A.B.'s karate instructor and was friends with A.B. and A.B.'s father.  Ruth stated he did not notify the police regarding the kiss between Holt and A.B.  However, he said he immediately told A.B.'s father about the inappropriate nature of the kiss.  Ruth did not know whether A.B.'s father called the police about the incident.

On redirect examination, Ruth confirmed that Holt kissed A.B. on the mouth.  He stated, "This is the kind of kiss that I wanted to jerk his tail out and whoop him [sic] for something that he shouldn't be doing."  He added that the kiss was "very [in]appropriate" because it was "like kissing your girlfriend."

---

[1]This court refers to minor victims of sex crimes as well as family members of minor victims by initials when appropriate.

[2]According to the transcript from the Rule 404(b) hearing, this note was admitted as an exhibit. Although the note was read by A.B. during the hearing, the physical note was not included in the record on appeal.  However, the contents of the note are undisputed.

**Trial.** At trial, A.B., Charles Ruth, Detective Mike Kearney, and J.M. testified for the State, and Officer Dana Ward, Michael Turner, Keith Turner, Melissa Crabtree, and Chris Burkett testified for the defense. Defendant-Appellant Holt elected not to testify.

A.B., age sixteen, testified he was in the ninth grade at Jefferson County High School in the fall of 2008. He stated that on October 26, 2008, he turned fifteen years old. A.B. stated that the Defendant Margaret Holt, whom he also knew as "Macey," was a teacher's aid or assistant in his first period class. A.B. said he talked to Holt in class, but their relationship became more than a teacher-student relationship after Holt put a note on his desk in class. The note from Holt stated, "I wish you could spend the night with me this weekend[,] but I understand that you can't." Before giving Holt the note back, A.B. wrote on the note, "It ain't because of my dad, it's because of my girlfriend[,] and I'm not going to cheat on her." Holt responded by writing, "Okay[,]" before passing the note back to A.B.[3]

A.B. stated that Charles Ruth, a family friend and his karate instructor, drove him to Holt's home sometime during the fall of 2008. A.B. said that Holt gave him directions to her apartment over the phone as they were driving. Upon their arrival, A.B. stated that Holt came outside and that Ruth rolled down his window so that Holt could talk to A.B. Holt told A.B. that she was glad he had visited her. A.B. and Holt then discussed another student, J.M. A.B. explained that he became aware of Holt's sexual relationship with J.M. when he heard Holt talking to a female student in class about J.M. When A.B. asked Holt about J.M., Holt told A.B. that J.M. was a student with whom she had sexual intercourse. Holt then held up one finger to indicate that she had sex with J.M. one time. Before A.B. and Ruth left Holt's home, Holt walked around to A.B.'s side of the car, opened his door, leaned in and hugged him, and then kissed him on the lips. A.B. said that Ruth witnessed this kiss. Ruth later told A.B. that he was "disappointed" in A.B.'s and Holt's behavior, especially since Holt was an adult.

A.B. also said that Holt picked him up as he was walking to Talbott Elementary School to catch his school bus. After A.B. got in Holt's car, she dropped off her two oldest children at Jefferson Elementary School and then dropped off her youngest child at her parents' house. A.B. said that Holt drove them to a deserted area on Quarry Road in Jefferson County and pulled her car over on the side of the road. Holt leaned over and performed oral sex on A.B. Holt then got out of the car, opened A.B.'s passenger door, and they both got in the back seat of Holt's car and had sexual intercourse. According to A.B., Holt got in the back seat and removed her pants, and A.B. unzipped his pants and got on top

---

[3]According to the trial transcript, this note was admitted as an exhibit. Although the note was read by A.B. during the trial, the physical note was not included in the record on appeal. As previously stated, the contents of the note are undisputed.

of Holt. They changed positions, and Holt got on top. A.B. said he was fourteen at the time that he and Holt had sexual intercourse.

A.B. told Holt that he did not want to be late for school. Holt dropped off A.B. at the front door of the high school at approximately 7:40 or 7:50 a.m., just before school started. Holt then parked in her parking spot before walking into class. A.B. said that Holt acted "normal" in class. Holt later told A.B. that if she knew they would not get caught they could go to the janitor's closet.

A.B. stated that Ruth talked to him when he found out Holt and A.B. had sexual intercourse. Ruth told A.B. that he was "highly upset" with him and that he and Holt should have known better than to get sexually involved.

At a later time, A.B. and Holt had an argument in class, and Holt called him an "A-hole[.]" A.B. got up and told Holt, "I ain't [sic] no F-ing A-hole," and the teacher sent him to the assistant principal's office.

On cross-examination, A.B. acknowledged telling the police that Holt dropped him off at school at 8:05 a.m. after they had sexual intercourse. He admitted that 8:05 a.m. was probably more accurate than 7:40 or 7:50 a.m., since he had given this time to the police shortly after the incident occurred. A.B. acknowledged telling Detective Kearney that Holt was angry at him in class because he told her "to stop when we were having sex in the backseat" of her car. A.B. said that Ruth did not call the police about the kiss between Holt and A.B. but did inform A.B.'s father about the incident when he dropped off A.B. at his father's store. A.B. said that his father did not call the police about the incident and did not report the incident to the school principal.

Although A.B. could not recall the time of the kiss and the Quarry Road incident at trial, he acknowledged telling the police that he had sexual intercourse with Holt the day after Holt kissed him in the presence of Ruth. A.B. also acknowledged telling the police in his statement that he got in Holt's backseat and lay down with his hands behind his head while she had sex with him. Holt stated he gave his statement to police approximately one month after he and Holt had sexual intercourse. He said he finally told his father that he had sexual intercourse with Holt because he was trying to explain why he and Holt had been arguing in class. He also said that this was the first time any adults became aware of the fact that he had sexual intercourse with Holt. A.B. said that the first time he told anyone about the note from Holt was when he gave it to the principal and the police at the time he gave his statement.

-4-

On redirect examination, A.B. said he did not know who J.M. was before he heard Holt talking about J.M. in class. He further stated he and J.M. did not talk and were not friends. He denied that he and J.M. decided to invent a story about Holt.

Charles Ruth, age twenty-seven, testified he met A.B. when A.B. began taking karate lessons from him approximately five years prior to the offense. Ruth said that he and A.B. developed a father-son type of relationship and that he often watched over him. Ruth said he first met Holt when A.B. asked him to drive him to meet a girl in the fall of 2008. Holt gave A.B. the directions to her apartment over the telephone as they were driving. Upon their arrival, Holt walked over to the driver's side window, which was down, and leaned inside the car to talk to A.B., who was in the passenger's seat.

Ruth noticed that Holt was old enough to be A.B.'s mother and asked Holt if she had any children. She replied that she had children who were asleep. He said that Holt had on a "low-cut top" that was a "dress-to-impress kind of deal". Holt asked A.B. how she looked, and A.B. responded that she looked "pretty good." Ruth recalled A.B. asking Holt if she was still seeing another student from school; however, Ruth was unable to remember the other student's name. Holt asked A.B. if he was going to meet her in the morning. She said, "[D]on't get on the bus, I'll be upset." Ruth said that it was clear that Holt and A.B. had a "planned meeting" in which Holt would pick up A.B. Holt also told A.B. that he could come back to her home and stay with her any time since he now knew where she lived. Ruth said that he felt "really uncomfortable" with the situation and told A.B. several times that it was time to leave. Before they left, Holt walked around the car, opened the passenger door, and leaned in and gave A.B. a kiss on the mouth. Ruth said that "[t]his was not a plant-a-kiss-on-your-mom kiss" but the type of kiss you would give to your girlfriend.

Ruth said he felt as if he had been "duped" into taking A.B. to see Holt. Ruth told A.B. that it was inappropriate to have a relationship with someone so much older than him and that he was never going to take A.B. to see Holt again. Ruth also said that he was going to tell A.B.'s father about the relationship between Holt and A.B. As soon as they got back to the store, Ruth told A.B.'s father what he had witnessed between Holt and A.B. At a later date, Ruth said that A.B. told him that he and Holt had gone "driving around" and had "slept together." Ruth immediately informed A.B.'s father that A.B. and Holt had a sexual relationship. He said that he was extremely disappointed that A.B. had lied to him about ending things with Holt, and A.B. promised him he was not going to see Holt again. Ruth said that A.B. never denied that he had sexual intercourse with Holt but claimed that it had happened only one time.

On cross-examination, Ruth said he did not call the police or notify A.B.'s principal about the kiss between Holt and A.B. because he believed that A.B.'s dad would take that

action. Ruth also said he told A.B.'s father that Holt had talked about meeting A.B. the following morning after the kiss. Ruth did not know why A.B. would say that his father did not know about the relationship with Holt until the day that he gave his statement to the police. Ruth could not explain why A.B. claimed that the first time any adults heard about him having sexual intercourse with Holt was when he was in the principal's office with Detective Kearney. Ruth could not provide the exact date when A.B. informed him of his sexual relationship with Holt. Ruth confirmed that on November 24, 2008, he gave a statement to the police regarding the relationship between Holt and A.B.

Mike Kearney, a detective sergeant with the Jefferson County Sheriff's Department, testified he investigated the cases involving Holt, A.B., and J.M. Detective Kearney stated that in October 2008, Holt would have been thirty-five years old. He said that the investigation into this case started when the school resource officer, Maurice Solomon, contacted him to say that A.B.'s father, R.B., needed to talk to him. Detective Kearney met with R.B. at his store on November 20, 2008, and R.B. informed him that something was wrong with A.B. Detective Kearney told R.B. to contact him when A.B. was out of school so that they could talk. Later that day, R.B. called Detective Kearney on his cell phone, and Detective Kearney met R.B. and A.B. at R.B.'s store. Detective Kearney asked A.B. if there was anything he needed to tell him, and A.B. "kind of beat around the bush" but did not tell him anything except that a teacher had been trying to get him to come over to her home.

The next morning, November 21, 2008, Detective Kearney said that Dana Ward, the school resource officer for Jefferson County High School, contacted him and requested that he come to the high school because of an argument between Holt and A.B. in class. Detective Kearney informed the principal that he had begun an investigation because A.B.'s father was concerned about A.B. Then the principal talked to A.B. about his conduct in the classroom that day. After that, the principal, A.B., and A.B.'s father talked, and the principal asked Detective Kearney to come into the office. At that point, A.B. disclosed the fact that he and Holt had sexual intercourse and made a written statement to that effect. Detective Kearney said that A.B. "was scared . . . nervous, in fear he was in trouble for . . . having some kind of a relationship with a teacher." He stated that A.B. gave him directions to the location where the sexual intercourse occurred but that A.B. could not provide some of the road names. After providing the statement, A.B. gave him the note that Holt had given him in class. Detective Kearney also stated he later interviewed Charles Ruth because A.B. had disclosed to him that Ruth had once taken him to Holt's home.

A few days after A.B. gave his statement, Detective Kearney picked up A.B., and they drove the route that A.B. and Holt had taken the day they had intercourse. During the trip, Detective Kearney said that A.B. was able to tell him each turn he and Holt made and the location where they had intercourse, which was in a remote lot off of Quarry Road in

Jefferson County. He stated that it took approximately twenty-two minutes to drive from the location where Holt had picked up A.B. to the location of the incident on Quarry Road.

Detective Kearney also stated he interviewed Holt the same day that A.B. gave his statement in this case. Detective Kearney then read Holt's written statement to the jury:[4]

> . . . [A.B.] called me from his dad's store because I had asked him to see if his dad was hiring. I was trying to find a second job to work in the evenings and weekends. He wanted his dad's friend to drive him over. He asked his dad, while I was on the phone with him, if he could. His dad said yes. He also asked – he also asked his dad if I could give him a ride to school because he said he hated riding the bus and that he wanted to meet my kids. I picked him up outside the [Talbott-Kansas Elementary] school, and . . . we went straight to Jefferson Elementary. We dropped my kids off at school and went straight to the high school. We did not go anywhere[] else. I did not even stop for gas. I dropped him off at the front door. I went to my parking place and came inside.

Detective Kearney stated that Holt signed this statement on November 21, 2008. He questioned Holt about her claim that she took all three of her children to the elementary school because he knew that one of her children was not old enough to go to elementary school at the time of the incident. Detective Kearney stated that Holt immediately gave him a "deer in the headlights look" and then changed her story to state that she dropped off her two older children at the elementary school and then took her youngest child to her parents' house before driving A.B. directly to the high school. At that point, Holt became nervous and began crying.

Detective Kearney stated he also discovered another student victim in this case because A.B. told him that Holt also had a sexual relationship with J.M. He was not able to interview J.M. until the Monday after A.B. and Holt gave their statements. J.M.'s statement also indicated that Holt had sexual intercourse with him when he was fifteen years old. J.M. told Detective Kearney that Holt had given him a green Carhardt hooded jacket and had given him her cell phone number. Detective Kearney's investigation showed that this cell phone number was registered to Holt's father, Robert Crabtree.

On cross-examination, Detective Kearney said that A.B.'s father did not tell him that A.B. had kissed a teacher or had a sexual encounter with a teacher. He stated he did not discover that Holt and A.B. had sexual intercourse until he talked to A.B. at the high school

---

[4]Holt's statement was not included in the record on appeal.

on November 21, 2008.  Detective Kearney also stated that J.M. told him that he and Holt had sexual intercourse at his friend Michael Turner's house at a time when neither Turner nor Turner's father was present.

J.M., age seventeen, testified he first met Holt because she was a teacher's aid in his classroom at Jefferson County High School in 2008 when he was a sophomore.  He said he first came in contact with Holt, whom he knew as "Macey," when she began talking to him at school.  Shortly after they started talking, Holt gave J.M. a note with her telephone number, but J.M. threw the note away.  J.M. later informed Detective Kearney of the number that Holt had written on the note.  J.M. said that Holt later obtained his home telephone number.  She called his home, and J.M.'s father answered the phone and told her that J.M. was outside.  J.M.'s father later told him that a girl called, and, because he was curious, J.M. called the number that was on the caller identification, and Holt answered.  J.M. said he thought Holt first told him in class that she wanted to have sexual intercourse with him.

J.M. stated that Holt brought him food from McDonald's one time when he was staying at Michael Turner's house.  He explained that Michael Turner, who was in his forties, was a friend with whom he worked on the weekends.  J.M. said he knew Michael Turner's son because he and the son went to school and played baseball together.  He said he often spent time at Michael Turner's house on Friday afternoons and nights until Michael got home from work.  J.M. said he was able to get into Turner's house when he was not home by sliding a card through the lock to open the door.

Holt visited J.M. a second time at Michael Turner's house to show him her new car.  When they went inside Turner's home, Holt asked him if she could perform oral sex on him in the living room, and he consented.  Holt and J.M. then had sexual intercourse in the bedroom.  J.M. stated that no one else was present at Michael Turner's house at the time of the incident.  After Holt left Michael Turner's house, J.M. played basketball for a few minutes before he went to talk to Keith Turner, Michael Turner's father, who lived on the same property.  J.M. said he and Holt only had sexual intercourse one time.  J.M. said Holt gave him a Carhardt jacket at school.  He also stated that Holt told J.M. that she wanted to get him drunk so that she could have sex with him.

J.M. stated that in November 2008 he gave Detective Kearney a statement acknowledging that he had sexual intercourse with Holt.  J.M. told Detective Kearney what happened in the presence of the principal, his parents, and the school resource officer, Dana Ward.  However, he stated that his parents and Officer Ward stepped out of the room when he provided the details of the sexual encounter.  He stated that the incident with Holt occurred approximately one month before he gave his statement to Detective Kearney.  J.M. said he did not know A.B. at the time the incident with Holt occurred.

On cross-examination, J.M. acknowledged he told the police in his statement that Holt had performed oral sex on him in the bedroom, even though he had testified that this incident occurred in the living room. J.M. stated he did not tell anyone that he and Holt had sexual intercourse until he told Detective Kearney, in the presence of his principal and his parents, about it at school. J.M. said he first denied that the incident with Holt happened because he was afraid that he would get in trouble. Later, in the presence of his parents and Detective Kearney, J.M. admitted to the principal that he and Holt had sexual intercourse. J.M. also acknowledged telling Michael Turner that the incident with Holt did not happen at Turner's house.

Dana Ward, the school resource officer at the school attended by A.B. and J.M., was called to testify by the defense. She stated that R.B., A.B.'s father, had contacted her while she was in her patrol car outside the school. Officer Ward said R.B. told her that A.B. had gone over to Holt's home and showed her a note that Holt wrote to A.B. R.B. told her he was upset about A.B. going to Holt's apartment and wanted to talk to an officer to see what needed to be done. Officer Ward was unsure whether R.B. talked to her about A.B. before or after he talked to Detective Kearney. After talking with R.B., Officer Ward contacted Detective Kearney about A.B. going over to Holt's home. She also said she contacted Detective Kearney before A.B. had the argument with Holt in class. During the interview with A.B. conducted by Detective Kearney, Officer Ward sat in the room and took notes. Officer Ward said that the principal was also present during the interview and that the principal listened and asked some questions of A.B.

Michael Turner testified he disconnected his home telephone in early 2008, so it would have been impossible for anyone to receive a telephone call on his land line in late 2008. He also said that he put a deadbolt on the back door in October or November of 2008 because his fiancé was moving things into his house and that this lock prevented anyone from sliding a card into the door to open it. Michael Turner said he had a telephone conversation with J.M., in which J.M denied having sex with Holt in Turner's house. He also testified he had known J.M. for several years and that J.M. did not have a reputation for truthfulness.

On cross-examination, Michael Turner admitted that J.M. was able to gain access to his home without a key prior to him putting the deadbolt on the back door. He acknowledged he would not have known if J.M. had someone at his home if he was not there. He also admitted that J.M. knew that it would have been an abuse of his trust to have a woman in his house without him being present. Michael Turner said J.M. told him, in two different conversations regarding this matter, that Holt had never been in his house.

Keith Turner, Michael Turner's father, testified he lived 100 yards south of Michael Turner's house and had a very clear line of sight to his son's house from his property. Keith

asserted he had never seen Holt prior to this trial and had never seen her at his son's house. He added that he kept a very careful eye on his son's house and rarely left his home and property. Keith Turner said that anytime he saw a car at his son's house that he did not recognize, he would go over and investigate it. On cross-examination, he acknowledged he would not have known if someone was at Michael Turner's house if he were not at home.

Melissa Crabtree testified she was related to Holt and that she often took care of Holt's youngest daughter. She said that in October of 2008, Holt's two oldest children sat in booster seats and her youngest child sat in a carseat. Crabtree identified a picture of Holt's car with the two booster seats and one carseat in the backseat and opined it would be difficult to throw all three of these seats into the floorboard of the car.

On cross-examination, Crabtree acknowledged she was not present with Holt every day as she drove to school and that she would not have known whether Holt had taken the carseats out of her car on a particular day. She also acknowledged that she never saw Holt with A.B., and therefore, could not testify as to what happened in the car between Holt and A.B.

Chris Burkett, a licensed private investigator, testified he traveled the route from Talbott-Kansas Elementary School, to Jefferson County Elementary School, to Holt's parents' house on Cave Road, to the location of the incident on Quarry Road, and finally to the Jefferson County High School several times. Burkett stated that the aforementioned route was 27.9 miles and took him forty-seven minutes to drive.

On cross-examination, Burkett admitted he did not time the route beginning at Talbott-Kansas Elementary and ending at the location of the incident on Quarry Road. In addition, he admitted that if he had only timed the route from Talbott-Kansas Elementary to Quarry Road it would have reduced the total time he calculated. Finally, he acknowledged that there were some slight variations between the route that Detective Kearney took with A.B. and the route that he took in calculating the mileage and time.

Holt was convicted of attempted statutory rape by an authority figure in the case involving J.M. and statutory rape by an authority figure in the case involving A.B. She filed timely motions for a judgment of acquittal and a new trial on September 7, 2010. She then filed a notice of appeal on October 8, 2010. The trial court denied the motions for a judgment of acquittal and a new trial in an order filed on February 22, 2011 and entered nunc pro tunc to December 7, 2010.

## ANALYSIS

-10-

**I. Admissibility of Evidence.** Holt argues that the trial court erred in admitting evidence of the note and kiss to A.B. She asserts that "neither a continuing relationship nor intimacy were elements of the crime for which [she] was on trial." and that the only probative value of admitting evidence showing a continuing relationship or the degree of intimacy with A.B. was to show her propensity to commit similar acts with him in the future. Moreover, Holt contends that the fact that the note and the kiss were not crimes does not mean that they did not constitute bad acts under Rule 404(b). Finally, she argues that the danger of unfair prejudice outweighed the probative value of the note and that the trial court failed to find by clear and convincing evidence that Holt passed the note to A.B.

In response, the State contends that the note and the kiss "were relevant and admissible to show the defendant's intent and plan to commit the offense" and that the note provided an example of how Holt "used her authority as a teacher's assistant to accomplish the offense." In addition, the State argues that even if admission of this evidence was error, the error was harmless given the overwhelming evidence of Holt's guilt. We agree with the State.

Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait" but that such evidence may be admissible for "other purposes." Tenn. R. Evid. 404(b). "Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible." State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003) ("McCary II"). Rule 404 "establish[es] that character evidence cannot be used to prove that a person has a propensity to commit a crime." Id. (citing Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994)). Trial courts should take a "restrictive approach [to] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). The more similar the conduct or act to the crime for which the defendant is on trial, the greater the potential for a prejudicial result. McCary II, 119 S.W.3d at 243 (citing State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995)). Other crimes, wrongs or acts are admissible under Rule 404(b) when relevant to an issue other than the defendant's character, such as intent, motive, identity, common scheme or plan, or absence of mistake. Id.

Before trial, Holt filed a motion for the disclosure of uncharged conduct and a motion for the disclosure of potential Rule 404(b) evidence. At the April 5, 2010 hearing on these motions, the State asserted that it was seeking to introduce evidence of a note Holt had given to A.B. in class and a kiss between Holt and A.B. that occurred prior to the offense in this case. Defense counsel objected on the basis that the evidence was inadmissible pursuant to Rule 404(b). Specifically, defense counsel, citing State v. McCary, 922 S.W.2d 511, 514

(Tenn. 1996) ("McCary I"), argued that evidence of other crimes, wrongs, or acts is not admissible to prove intent where intent is not an element of the charged offense. Defense counsel argued that the evidence of the kiss and the note should be excluded under Rule 404(b) because they were "only relevant to show [Holt's] character or propensity [and] to basically inflame the jury[.]"

The trial court initially determined that Holt's kiss with A.B. was "certainly indicative of the course of their relationship that the State intends to prove[.]" It later concluded that Rule 404(b) did not preclude admissibility of the note because it was "relevant to show the continuing relationship and the degree of intimacy between [Holt] and [A.B.]" The court held that "the danger of unfair prejudice to the defendant [was] outweighed by the probative value to the State." The court also determined that the note was not "criminal conduct" and asserted that Holt, in her statement to police, had denied that she and A.B. had sexual intercourse.

Regarding the kiss, the court found that the kiss was "not a criminal act" and that the kiss was "highly probative of the degree of intimacy between the defendant and [A.B.], and any danger of unfair prejudice [was] outweighed by . . . its probative value."

After the jury began its deliberations, the court explained its ruling that the kiss and the note were admissible:

> For clarification, the Court was not persuaded that all of the just described evidence amounted to bad acts or wrongs as contemplated by State v. Parton in Tennessee Rule[] of Evidence 404(b). That being said, the Court did analyze, one, the communication contained in the note at issue. It's not the type of bad act or wrong[] contemplated by 404(b) in Parton. However, assuming that it was, the evidence was, one, relevant to prove the material issue in this case, which was the degree of intimacy between the defendant and the victim, [A.B.]. And the defendant denies – as the defendant denies the two of them had any relationship beyond that of teacher's aid and student. And the Court – then the Court held that the probative value of the evidence outweighed the dan[ger] of unfair prejudice to the defendant.

> . . . .

> With regard to the testimony from the witnesses about the kiss alleged to have been given by the defendant to the alleged victim, [A.B.], the act, while not being a crime, could be held against an accused as being a morally wrong act, and therefore, the Court made the determination whether to admit

-12-

this evidence pursuant to Tennessee Rule[] of Evidence 404(b) and . . . State v. Parton. The Court was and is of the opinion that the evidence is also relevant to prove the material issue concerning the degree of intimacy between the defendant and the alleged victim, [A.B.], as the defendant has denied that she had any relationship with the alleged victim, [A.B.], other than that of teacher's aid and student. Then the Court found that the probative value of this evidence outweighed the danger of unfair prejudice to the defendant.

The State initially argues that the trial court did not abuse its discretion in admitting evidence of the note and the kiss because this evidence did not constitute a crime, wrong, or bad act under Rule 404(b). See State v. Reid, 213 S.W.3d 792, 814 (Tenn. 2006) ("The testimony that Roberts saw the defendant in the possession of weapons similar to those used in the crimes did not necessarily constitute evidence of a bad act."); State v. Charles Lincoln Faulkner, No. E2006-02094-CCA-R3-CD, 2008 WL 2242531, at *8 (Tenn. Crim. App., at Knoxville, June 2, 2008) ("[I]f the act is not necessarily bad, no 404(b) issue exists."). The State specifically contends that the note and the kiss "were not necessarily criminal or wrongful acts." We disagree.

We conclude that the note from Holt, a teacher's aid, to A.B., a student in her class, stating that she wished A.B. could spend the night with her that weekend does constitute a wrong under Rule 404(b). As a initial matter, though not raised by either party, in our view the note was admissible as an admission of a party opponent pursuant to Rule 803(1.2) of the Tennessee Rules of Evidence because it contained Holt's written statement to A.B. requesting that he "spend the night" with her. In addition, the note, which was admitted in its entirety, contained A.B.'s written response to Holt that although his father would allow it, A.B. did not want to spend the night with Holt because he did not want to cheat on his girlfriend. The defense failed to object to A.B.'s written response in the note on hearsay grounds or any other grounds when it was admitted at trial. Regardless, we conclude that the note constituted a wrong pursuant to Rule 404(b). We further conclude that Holt's romantic kiss to A.B., a fourteen-year-old student in her class at the time, also constituted a bad act under Rule 404(b).

Holt argues that evidence of other crimes, wrongs, or acts is inadmissible to prove intent where intent is not an element of the charged offense. See McCary I, 922 S.W.2d at 514 (holding that testimony by an individual about the defendant's unindicted criminal behavior with him was inadmissible to prove the defendant's intent to commit the offenses against the victims in that case pursuant to Rule 404(b) because intent was not an element of the charged offenses of aggravated sexual battery, sexual battery, rape, and statutory

rape).[5]  The State responds that, even if Rule 404(b) applies, the trial court properly admitted the evidence because the note and the kiss "established the defendant's intent to engage in the illegal act for which she was ultimately convicted."

We agree with the State's assertion that the note and the kiss were admissible to prove Holt's intent to commit the offense in this case.  Section 39-13-532(a) defines the offense of statutory rape by an authority figure:

> Statutory rape by an authority figure is the unlawful sexual penetration of a victim by the defendant or of the defendant by the victim when:
>
> (1) The victim is at least thirteen (13) but less than eighteen (18) years of age;
>
> (2) The defendant is at least four (4) years older than the victim; and
>
> (3) The defendant was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional, or occupational status and used the position of trust or power to accomplish the sexual penetration; or
>
> (4) The defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual penetration.

T.C.A. § 39-13-532(a).  The State acknowledges that the offense of statutory rape by an authority figure does not plainly dispense with a mental element.  However, it argues that section 39-11-301 applies to the charged offense in this case:

> (b) A culpable mental state is required within this title unless the definition of an offense plainly dispenses with a mental element.

---

[5]Although  McCary I, 922 S.W.2d at 514, held that bad or wrongful act evidence was inadmissible because intent was not an element of the offense, under our later revised Code,  if an offense fails to specify or "plainly dispense[s] with" a mental state then "the state must prove, at a minimum, that the defendant acted recklessly."  See Tennessee Code Annotated §39-11-301(b), (c); State v. Ballinger, 92 S.W.3d 881, 889-90 (Tenn. Crim. App. 2001).

(c) If the definition of an offense within this title does not plainly dispense with a mental element, intent, knowledge or recklessness suffices to establish the culpable mental state.

T.C.A.§ 39-11-301(b), (c). The State asserts that because the mental state in the statute regarding statutory rape by an authority figure is neither designated nor "plainly dispensed with," the State "must prove, at a minimum, that the defendant acted recklessly" in committing this offense. See Ballinger, 93 S.W.3d at 890 ("[B]ecause the statute defining statutory rape neither specifies nor plainly dispenses with a culpable mental state, we conclude that the state must prove that the defendant, at a minimum, recklessly engaged in sexual penetration of a victim between the ages of thirteen and eighteen and that the defendant was at least four years older than the victim.").[6] We note that the Sentencing Commission Comments to section 39-11-301 further support the State's assertion that it must prove, at a minimum, that the defendant acted recklessly in committing the offense of statutory rape by an authority figure:

> An intent to punish without the requirement of a culpable mental state must be clear from the language of the statute creating the offense. Pappas v. State, 135 Tenn. 499, 188[] S.W. 52 (1916). Under subsection (c), offenses within this title which are silent regarding whether a culpable mental state is required will be presumed to require at least recklessness. The better reasoned cases from other jurisdictions have reached this result in interpreting common law authorities. See, e.g., People v. Angelo, 246 N.Y. 451, 159 N.E. 394 (1927).

T.C.A. § 39-11-301 (b), (c), Sentencing Comm'n Comments.[7]

---

[6] The court in Ballinger recognized that the Legislature "plainly dispensed with" a culpable mental state when it defined the offense of driving under the influence in section 55-10-401(a) to include "mere physical control of a vehicle." Ballinger, 93 S.W.3d at 890 n.3.

[7] The trial court gave the following instruction regarding the offense of statutory rape by an authority figure, in pertinent part:

> Any person who commits the offense of statutory rape by an authority figure is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven, beyond a reasonable doubt, the existence of the following essential elements: One, that the defendant had unlawful sexual penetration of the alleged victim or the alleged victim had unlawful sexual penetration of the defendant; and, two, that the alleged victim was at least 13 years of age but less than 18 years of age; and, [three], that the defendant was at least four years older than the alleged victim; and, four, that the defendant acted either
>
> (continued...)

Accordingly, based on the aforementioned authorities, the State was required to prove, at a minimum, that Holt recklessly used her position of trust as a teacher's aid to accomplish the unlawful sexual penetration with the victims. Naturally, proof that Holt acted intentionally or knowingly in committing these offenses was also sufficient. See Ballinger, 93 S.W.3d at 890 n.2.

Rule 404(b) states that the following conditions must be satisfied before admitting evidence of other crimes, wrongs, or acts:

(1)     The court upon request must hold a hearing outside the jury's presence;

(2)     The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3)     The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4)     The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Assuming a trial court substantially complies with the requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). However, if a trial court fails to substantially comply with the requirements of the rule, then the trial court's decision is not entitled to deference by the reviewing court. Id.

The State argues, and we agree, that the trial court substantially complied with the requirements of Rule 404(b). The record shows that the trial court correctly held a 404(b) hearing outside the jury's presence. The trial court determined that a material issue existed other than conduct conforming to a character trait and stated the material issue, its ruling, and

_____

[7](...continued)
intentional, knowingly or reckless.

Moreover, we note that the Tennessee Pattern Jury Instruction 10.05(b) states that the jury must find that the defendant acted "intentionally, knowingly or recklessly" before convicting the defendant of the offense of statutory rape. See T.P.I. Crim. 10.05(b) (15th ed. 2011); see also Ballinger, 93 S.W.3d at 890 n.4.

its reasoning for the ruling on the record. Specifically, the trial court found that the material issue regarding the note was that the note was "relevant to show the continuing relationship and the degree of intimacy between [Holt] and [A.B.]" The court also noted that Holt in her statement to the police had specifically denied that she and A.B. had sexual intercourse. Finally, the court found that "the danger of unfair prejudice to the defendant is outweighed by the probative value to the State." Regarding the kiss, the court stated that the material issue, other than conduct conforming to a character trait, was that the kiss was "highly probative of the degree of intimacy between the defendant and [A.B.." In addition, the court found that "any danger of unfair prejudice [was] outweighed by . . . its probative value." We conclude that the trial court's findings as to the material issue regarding the note and the kiss were sufficiently related to the issue of intent, that is, whether Holt acted recklessly, intentionally, or knowingly in committing these offenses. We also conclude that the trial court properly found that the probative value of the note and the kiss outweighed the danger of unfair prejudice. A review of the record shows that the trial court failed explicitly to find that proof of the note and the kiss were clear and convincing, although Holt only takes issue with the trial court's failure to make the clear and convincing determination as to the note.

The State argues that the trial court satisfied the condition that proof of the note was clear and convincing. It contends that the trial court's finding that the note was properly authenticated, in light of A.B.'s testimony that Holt personally delivered the note to him, was tantamount to a finding by the trial court that proof of the note was clear and convincing. Here, the court ruled that A.B. properly authenticated the note: "Whether or not this defendant actually wrote the message, . . . [Holt] personally delivered the message to him and then [A.B.] made a reply that she replied to [sic]. So it is a properly authenticated communication from the defendant to [A.B.]." We disagree that the trial court's finding that the note was properly authenticated equated to an explicit finding on the record that proof of the note was clear and convincing. However, we do conclude that the trial court substantially complied with the conditions of Rule 404(b) under the facts of this case. See Tenn. R. Evid. 901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims."); see also State v. Ray Anthony Nelson, No. 03 C01-9706-CR-00197, 1998 WL 694971, at *8-9 (Tenn. Crim. App., at Knoxville, Sept. 9, 1998) (stating that the trial court substantially complied with Rule 404(b) when it met all the requirements of the rule except for the need to make a clear and convincing evidence determination and the record showed that "there was no real question" that the alleged acts occurred), perm. app. denied, (Tenn. Sept. 11, 2000).

Because the trial court substantially complied with Rule 404(b), we must lastly determine whether the trial court abused its discretion in admitting evidence of the note and the kiss. We previously held that the note and the kiss were material to Holt's intent and plan

to commit the offense in this case and that the probative value of this evidence outweighed the danger of unfair prejudice. Accordingly, we conclude that the trial court did not abuse its discretion in admitting this evidence. However, even if this evidence was not admissible to prove Holt's intent and plan to commit the offense in this case, we note that evidence of this type has previously been deemed admissible by this court on other grounds. In McCary, regarding cases involving aggravated sexual battery, sexual battery, and statutory rape, this court concluded that pornographic magazines and videotapes found in the defendant's possession were "probative" because they "tended to corroborate the account provided by each victim that the defendant used pornography as a means of seduction." McCary II, 119 S.W.3d at 246. Similarly, the kiss and the note were utilized by Holt as a means of seducing A.B. and accomplishing the unlawful sexual penetration, and this evidence corroborated A.B.'s account of the events. Accordingly, Holt is not entitled to relief on this issue.

We hasten to add that even if the admission of the evidence of the note and the kiss was improper, such error was harmless given the overwhelming evidence of Holt's guilt. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."); see also McCary II, 119 S.W.3d at 244 ("Because there was abundant proof of the defendant's guilt, however, these errors [in admitting the unindicted sex crimes] would have qualified as harmless, having no effect on the verdict." (citing Tenn. R. Crim. P. 52(a) (deleted 2009); Tenn. R. App. P. 36(b)).

**II. Sufficiency of the Evidence.** Holt also argues that the evidence was insufficient to support her convictions for statutory rape by an authority figure and attempted statutory rape by an authority figure. In response, the State argues that the convictions should be affirmed because when viewed in the light most favorable to the State, the evidence established that Holt, a teaching assistant at a high school, "engaged in sexual intercourse on separate occasions with two male teenage students[.]"

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is

direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456–58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457 (citation omitted)). This Court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); Carruthers, 35 S.W.3d at 557. The court in Dorantes specifically adopted the standard established by the United States Supreme Court in the Holland case regarding circumstantial evidence:

"Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

Here, Holt was convicted of statutory rape by an authority figure involving A.B. and attempted statutory rape by an authority figure involving J.M. Again, section 39-13-532(a) defines the crime of statutory rape by an authority figure:

(a) Statutory rape by an authority figure is the unlawful sexual penetration of a victim by the defendant or of the defendant by the victim when:

(1) The victim is at least thirteen (13) but less than eighteen (18) years of age;

(2) The defendant is at least four (4) years older than the victim; and

(3) The defendant was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional, or occupational status and used the position of trust or power to accomplish the sexual penetration; or

(4) The defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual penetration.

Statutory rape by an authority figure is a Class C felony. T.C.A. § 39-13-532(b). Pursuant to section 39-13-501(7), sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]"

The statute regarding statutory rape by an authority figure does not require that a defendant used his or her position of authority to <u>force</u> the sexual penetration; instead, the statute states only that the defendant used his or her power to <u>accomplish</u> the sexual penetration. <u>See</u> <u>State v. Bryan Dale Farmer</u>, No. M2007-01553- CCA-R3-CD, 2008 WL 3843847, at *7 (Tenn. Crim. App., at Nashville, Aug. 18, 2008) (stating that the defendant used his position as a teacher or coach to accomplish the offense of sexual battery by an authority figure), <u>perm. app. denied</u>, (Tenn. March 2, 2009). Accordingly, if the evidence shows that a defendant used his or her position to cultivate an improper relationship with the victim and to bring about or bring to completion sexual penetration with the victim, then this evidence is sufficient to support the conviction for statutory rape by an authority figure. <u>See</u> <u>id.</u> at *8.

The offense of criminal attempt is defined as follows:

-20-

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a). The offense of attempted statutory rape by an authority figure is a Class D felony. Id. § 39-12-107(a).

We conclude that the evidence was more than sufficient to support Holt's convictions for statutory rape by an authority figure involving A.B. and attempted statutory rape by an authority figure involving J.M. Holt was a teacher's assistant in classes attended by A.B. and J.M. Holt specifically contends that the testimony of A.B. and J.M. was not believable. In addition, she claims that the State put on no proof that she used her authority at a teacher's assistant to commit the offenses against A.B and J.M. Finally, she argues that "expressing the desire to engage[] in illegal activity" with J.M. was not sufficient to constitute a substantial step towards completion of the offense as is required for criminal attempt. Although Holt claims that the testimony of A.B. and J.M. was not believable, it was the jury's prerogative to determine the credibility and weight given to A.B.'s and J.M's testimony, as well as the testimony of the other witnesses, and we will not "reweigh or reevaluate the evidence." See Henley, 960 S.W.2d at 578-79. Moreover, we conclude that the State presented ample proof that Holt used her position of authority to commit the offenses against A.B. and J.M. The State clearly established that A.B. and J.M. did not know Holt before she began to cultivate an inappropriate relationship with them while she was a teacher's aid in their classes. Both A.B. and J.M. knew Holt as "Macey" and testified that Holt communicated with them in class by writing them personal notes. A.B. testified that Holt told him in class that she and J.M. had sexual intercourse one time. J.M. testified that Holt first told him in class that she wanted to have sex with him. Finally, we agree with the State that the evidence presented at trial was sufficient to support Holt's conviction for the greater offense of statutory rape by an authority figure in the case involving J.M. See

McDonald v. State, 512 S.W.2d 636, 640 (Tenn. Crim. App. 1974) (holding that "the defendant cannot complain of the jury finding him guilty of the lesser offense" if the evidence was sufficient to convict the defendant of the greater offense charged). Accordingly, Holt is not entitled to relief.

## CONCLUSION

Upon review, we conclude that the trial court did not err in admitting evidence of the note and the kiss between Holt and A.B. We further conclude that the evidence at trial was sufficient to support Holt's convictions for statutory rape by an authority figure involving A.B. and attempted statutory rape by an authority figure involving J.M. The judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE